**Brigitte HATZENBUEHLER,**
**Appellant**

**v.**

**Jens ESSIG, Appellee**

**NO. 01-16-00515-CV**

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued July 6, 2017

John M. Zukowski, Pascal Paul Piazza, Zukowski, Bresenhan & Piazza, L.L.P., 1177 W. Loop South, Suite, for Appellant.

John L. Urban, pro hac vice admission, Christian T. Fahrig, pro hac vice admission, Urban Thier & Federer, P.A., 200 S. Orange Avenue, Orlando, Florida 32801, David S. Toy, SPAGNOLETTI & CO, 401 Louisiana Street, 8th Floor, Houston, TX 77002, for Appellee.

Panel consists of Justices Keyes and Bland.*

**OPINION ON REHEARING** [1]

Jane Bland, Justice

This appeal from a special appearance arises out of a dispute between German

---

* Justice Huddle was a member of the original panel but has resigned in the interim. The two remaining justices ruled on this motion. *See* TEX. R. APP. P. 49.3(b).

1. Hatzenbuehler moved for rehearing of our May 23, 2017 opinion and judgment. We deny the motion for rehearing. We with-

citizens concerning the provenance of a cauldron discovered in a Bavarian lake. Josef Hatzenbuehler sued Jens Essig, alleging that Essig and others falsely represented the cauldron to be of ancient Celtic origin. With Essig's assistance, Josef purchased the cauldron at a Swiss bankruptcy sale. Josef alleged that he later discovered that the cauldron was likely created by the Nazis in the 1940's, making it significantly less valuable.

Josef died during the pendency of the suit and his widow, Brigitte Hatzenbuehler, succeeds him as plaintiff. The live pleading alleges that Essig committed fraud, fraudulent inducement, negligent misrepresentation, and breach of contract in connection with the cauldron transaction.

Essig specially appeared, contending that the trial court lacked personal jurisdiction over him. The trial court agreed, granted the special appearance, and dismissed the suit.

Brigitte Hatzenbuehler appeals, contending that the trial court erred in granting the special appearance. We affirm.

## Background

During the relevant time period, the Hatzenbuehlers resided in Texas, but they returned to Germany to visit family and friends during holidays. Essig, a resident of Germany, has never visited Texas and has no property or agents in Texas.

According to the pleadings, Essig and others discovered an artifact known as the Chiemsee Cauldron while exploring a Bavarian lake. The cauldron reportedly was of pre-Christian, Celtic origin. Starting in 2008, Josef discussed the discovery of the cauldron several times with Essig during the Hatzenbuehlers' annual holiday visits to Germany. Josef, a collector of antiques and artifacts, expressed an interest in acquiring the cauldron. He requested information concerning its authenticity and value. Essig told him that the cauldron was in the possession of a bankruptcy estate in Switzerland and was to be sold at the estate auction in Switzerland.

Josef and Essig continued phone and e-mail contact through 2014. Throughout this period, during which Josef resided in Houston and Essig in Switzerland, Essig repeatedly represented that the cauldron was authentic and of great value. In March 2014, Essig sent an e-mail to Josef confirming he had materials that authenticated the cauldron and its value. Essig informed Josef that Essig had been qualified to place a bid on the cauldron as a creditor of the Swiss bankruptcy estate. Essig and Josef discussed an assignment of Essig's bidding rights to Josef so that Josef could acquire the cauldron at the Swiss auction.

Josef, while in Houston, drafted a Letter of Intent to share profits earned on the cauldron's sale. The parties signed the LOI on or about April 13, 2014. The letter of intent declared that it was non-binding, but it outlined the parties' understanding that

- Josef would bid on the cauldron with the intent of purchasing it and gaining sole ownership of it;
- Essig would assist Josef in obtaining the winning bid;
- Essig would provide Josef with a list of all information in his possession concerning the cauldron, including reports, tests, specifications, articles, and agreements, for the purpose of determining a bid ceiling; and

draw our prior opinion and judgment and issue the following opinion and judgment in their stead.

- The parties would each earn 50% of the profits, less costs and expenses incurred by Josef in connection with the acquisition, holding, and subsequent sale of the cauldron.

Later that month, the parties circulated a draft profit-sharing agreement, which provided for the application of Texas choice-of-law rules and includes Texas venue provisions. The draft agreement was never executed.

About a month after the parties signed the non-binding LOI, in May 2014, the Hatzenbuehlers traveled to Zurich, Switzerland, to view the cauldron and meet with Essig and others, including Josef's Swiss attorney. By that time, the Hatzenbuehlers had heard rumors in Germany and Switzerland that the cauldron was not of ancient Celtic origin, but instead had been created by the Nazis, who dumped the cauldron in the Bavarian lake in 1945. Essig assured the Hatzenbuehlers "many times during the trip to Zurich" that the cauldron was of ancient Celtic origin and that experts would confirm its provenance. Josef decided to proceed with the purchase and told those present that, after he purchased the cauldron, he planned to ship it to Houston for marketing in the United States because of the rumors in Germany and Switzerland that its provenance was suspect.

Essig and Josef then negotiated a Preliminary Agreement to address the acquisition of the cauldron. They had a German attorney draft the agreement and forward the draft to Josef in Houston. Josef then traveled to Munich, Germany to sign it. The Preliminary Agreement, which expressly replaced the letter of intent, recited that "both parties are Germans" and that it is made "according to German Law." According to its terms,

- Essig assigned to Josef Essig's right to bid at the Swiss auction;

- Josef became the sole owner of the cauldron upon his purchase of it and had the sole right to decide its location;

- Essig promised to give Josef, when required, all of the available expertise and reports, work results, and investigation materials relating to the cauldron;

- Josef assumed all acquisition and storage costs for the cauldron;

- Josef retained sole control concerning the cauldron's transport to the United States and its storage; and

- Essig's 50% net share of profits from the cauldron's sale would be distributed after deduction of costs incurred by Josef in acquiring, storing, and selling the cauldron, plus 10% interest for Josef's costs and expenses.

The draft initially proposed that the parties would mutually decide where the cauldron would be stored, but Josef did not agree to that provision, and struck the proposed language before he signed it. Essig signed the Preliminary Agreement and wrote his initials by the stricken language to denote his acceptance of that modification. No agreement addressing the holding, marketing, and subsequent sale of the cauldron after the auction was ever executed by the parties.

The auction of the cauldron took place on July 4, 2014 in Zurich, Switzerland. Josef, acting through a Texas corporation that he had created for the purpose, won the auction and bought the cauldron. The Swiss bankruptcy estate transferred ownership of the cauldron directly to Josef in Switzerland by executing a Sale of Cauldron Agreement, which was prepared in German, with Josef to take sole ownership and possession of the cauldron in Switzerland. The Sale Agreement does not men-

tion Essig or confer any rights on Essig. It reflects that Josef ["the Buyer"] would take full responsibility for the cauldron's removal and transport. Josef had declared that the cauldron was "not intended for the Swiss market," and would be "shipped abroad," but had not identified any specific market. Josef arranged to transport the cauldron he then owned to Texas.

Several weeks after the auction, the Hatzenbuehlers discovered that several years earlier, eight experts had examined the cauldron in connection with a lawsuit. Those experts uniformly had concluded the cauldron was not of ancient Celtic origination, but was more recently created. Essig had reason to know of those experts' findings before he entered into the agreement with Josef, but he never told Josef about them.

Numerous disputes between the parties led to this suit, which Josef brought against Essig in Harris County District Court. Essig filed a special appearance. In an accompanying affidavit, Essig averred that he (1) has no offices in Texas; (2) has no property in Texas; (3) pays no taxes in Texas; (4) has no employees in Texas; (5) does not advertise in Texas; (6) has never visited or traveled to Texas; (7) does not conduct business in Texas; and (8) has no agent for service of process in Texas. Josef responded that Essig had purposefully availed himself of engaging in business in Texas by entering into a business deal with a Texas resident with the intention of reselling the cauldron in Texas and that, through their communications, Essig had established minimum contacts with Texas sufficient to establish grounds for specific personal jurisdiction.

## SPECIAL APPEARANCE

### A. Standard of Review

■ Whether a court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). When a defendant challenges the exercise of personal jurisdiction in a special appearance, the plaintiff and the defendant bear shifting burdens. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the initial burden of pleading allegations that bring a nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). If the plaintiff meets that burden, the burden shifts to the nonresident defendant to negate all bases of jurisdiction alleged by the plaintiff. *Kelly*, 301 S.W.3d at 658; *Glattly v. CMS Viron Corp.*, 177 S.W.3d 438, 446 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

The trial court must frequently resolve fact questions before deciding the jurisdictional question. *BMC Software*, 83 S.W.3d at 794. In this case, however, the parties do not dispute the relevant jurisdictional facts, only their application to the law.

■ When, as in this case, a trial court does not issue findings of fact or conclusions of law, we imply all relevant facts necessary to support the judgment if the evidence supports them. *Moncrief Oil*, 414 S.W.3d at 150. We will affirm the trial court's ruling on any legal theory that finds support in the record. *Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied).

### B. Applicable Law

■ A Texas court has personal jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction is consistent with federal due process. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex.

2002); *Curocom Energy LLC v. Young-Sub Shim*, 416 S.W.3d 893, 896 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West 2008). Federal due process requires that the nonresident defendant have purposefully established minimum contacts with the forum state, such that the defendant reasonably could anticipate being sued there. *Curocom Energy*, 416 S.W.3d at 896. The exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *Id.* (citing *Glattly*, 177 S.W.3d at 446). If the nonresident defendant has purposefully established minimum contacts with the forum state, then only in rare cases will a Texas court's exercise of personal jurisdiction not comport with fair play and substantial justice. *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991).

A nonresident's contacts can give rise to either general or specific personal jurisdiction. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017). "General jurisdiction is established when a defendant's contacts "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* (quoting *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011)). Specific jurisdiction is triggered when the plaintiff's cause of action arises from or relates to the defendant's contacts. *Id.* at 886.

As the Texas Supreme Court set forth in *Moncrief Oil International Inc. v. OAO Gazprom*,

> When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors:
>
> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or

a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

414 S.W.3d at 151 (first citing *Retamco Operating, Inc. v. Rep. Drilling Co.*, 278 S.W.3d 333, 338–39 (Tex. 2009); then citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 475, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985); and then citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). "This analysis assesses the quality and nature of the contacts, not the quantity". *Id.* (citing *Retamco*, 278 S.W.3d at 339); *Coleman*, 83 S.W.3d at 806–07.

If a plaintiff pleads sufficient jurisdictional allegations, then the nonresident defendant assumes the burden of negating all possible bases for jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The defendant can negate jurisdiction on a legal basis by showing that, "even if the plaintiff's alleged facts are true, ... that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Kelly*, 301 S.W.3d at 657.

## C. Hatzenbuehler made allegations under both tort and contract theories for exercising jurisdiction over Essig in Texas.

Essig's uncontroverted averments, set forth in his affidavit accompanying the

special appearance, preclude any showing of "continuous and systematic" contacts with Texas and thus conclusively demonstrate that Texas courts have no general jurisdiction over him. *See M & F Worldwide*, 512 S.W.3d at 885. The live pleadings allege the following alternative bases for the exercise of specific personal jurisdiction over Essig:

- Essig committed one or more torts in Texas;
- Essig "sought to contract with Josef in Harris County, Texas, and such contract was performable, in whole or in part, in Texas";
- Essig maintained minimum contacts with Texas, including "ongoing, purposeful, repeated and deliberate communications directed to Josef in Harris County, Texas, and for the purpose of doing business in Harris County, Texas," and Essig sought to benefit and profit from the contacts with Josef in Texas.

We agree with the trial court that none of these jurisdictional bases have been established.

**1. The evidence underlying the tort claims does not support a finding that the alleged torts were committed in Texas.**

 We first examine whether any evidence shows that Essig committed any tort in Texas. This is not a merits inquiry into what the parties thought, said, or intended, but rather a consideration into whether facts demonstrate that the parties had business contacts directed toward the forum. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005). Evidence that the defendant had Texas communications in planning to commit a tort in Texas is in itself insufficient to support specific jurisdiction. *See BMC Software*, 83 S.W.3d at 796–97.

Neither the business agreements nor the parties' communications show that Essig had the kind of contacts or communications with Texas that would confer jurisdiction in Texas state court, because the substance of the transactions occurred overseas. In *M & F Worldwide*, the Supreme Court of Texas considered whether two business meetings and "hundreds of e-mails and telephone calls" between the nonresident corporate defendants and the Texas resident co-defendants supported the exercise of specific jurisdiction in a case alleging that the defendants began formulating an out-of-state tort in Texas that culminated in the execution of a New York settlement agreement. 512 S.W.3d at 886–87. As the Court observed, the torts alleged—fraudulent transfer and tortious interference with contract, and conspiracy—"hinge[d] on the effect of the parties' execution of the New York settlement agreement and related conduct that occurred outside Texas." *Id.* at 887. The Court concluded that the nature of the fraudulent-transfer and tortious-interference claims demonstrated that they did not arise from the negotiations that occurred in Texas, "even if the evidence supports a finding that, during those negotiations, the ... defendants 'planned' to later commit such tortious conduct." *Id.* at 888.

The live pleadings allege that Essig "engaged in fraud which induced Josef to agree to enter into the preliminary or any other agreement" with Essig, and denies that any contractual arrangement between Josef and Essig existed after performance of the Preliminary Agreement. The Preliminary Agreement was executed in Switzerland, written in German, and made according to German law. That contract governed the parties' conduct in connection with Josef's acquisition of the cauldron at the Swiss auction; the obligations

under it were discharged at that time.[2] After he purchased the cauldron, Josef alone executed the Sale Agreement with the estate and had the cauldron shipped to Texas. Essig was not a party to the Sale Agreement and had no say over where the cauldron would be shipped or stored. The parties allegedly planned future conduct in Texas, but plans for future conduct directed at the forum is not sufficient to establish present personal jurisdiction on the basis that a tort has been committed in Texas. *See id.*

Acknowledging that the agreement was signed in Switzerland and that the auction took place in Switzerland, Brigitte responds that Essig and Josef's e-mail and telephone communications concerning the cauldron transaction occurred while Josef resided in Houston and Essig in Switzerland, and in these communications, Essig repeated Essig's misrepresentations concerning the cauldron's provenance. Brigitte introduced Josef's 2014 telephone records, which document 94 telephone calls between Essig's telephone number in Germany and Josef's telephone number in Texas. The evidence of telephone calls and e-mails between Essig and Josef, however, is not sufficient to establish that his alleged tortious acts were directed to Texas.

Essig's initial representations concerning the cauldron's provenance occurred in Germany. The pivotal representation that preceded the parties' execution of the Preliminary Agreement—Essig's alleged dismissal of rumors that the cauldron had Nazi origins and his assurances to Josef of the cauldron's Celtic origins—occurred in Switzerland, as did the purchase of the cauldron. The parties negotiated and reached the agreement that forms the basis of the fraudulent inducement claim while in Switzerland.

The Supreme Court of Texas has specifically rejected telephone calls, without more, as a basis for establishing personal jurisdiction based on a tort committed in the state. *Michiana,* 168 S.W.3d at 791 ("While the ubiquity of 'caller ID' may allow nonresidents to know a caller's telephone number, that number no longer necessarily indicates anything about the caller's location."). In *Michiana,* the Court observed that "changes in technology have made reliance on phone calls obsolete as proof of purposeful availment." *Id.* This conclusion applies with equal force to e-mail communications. *See Bryan v. Gordon,* 384 S.W.3d 908, 917 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[W]e believe the purposeful-availment analysis should not turn on the fortuity of where the Texas resident was physically located when the defendant e-mailed the contract or when the defendants made allegedly actionable misrepresentations by e-mail."); *Riverside Exports, Inc. v. B.R. Crane & Equip., LLC,* 362 S.W.3d 649, 655 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("Like telephone calls, e-mails do not necessarily indicate anything to the recipient about the sender's location. The physical address where one may send or retrieve an e-mail is no more fixed to a particular location than the address where one may send or receive a telephone call. We see no reasoned basis for distinguishing between the two means of communication, particularly when many of the same devices can be used for both.").

**2.** The Preliminary Agreement contains a provision that contemplates a future agreement between Josef and Essig to address the marketing, and distribution of any profits made in the sale of the cauldron, but that provision does not require those activities to be performed in any particular location, and Essig did not execute the draft profit-sharing agreement that Josef later provided.

 Jurisdictional analysis "centers on the *defendant's* actions and choices to enter the forum state and conduct business." *Kelly*, 301 S.W.3d at 660 (emphasis in original). The allegations and evidence supporting Brigitte's tort claims do not demonstrate Essig's choice to enter Texas and conduct business here, but in Switzerland.

**2. The evidence underlying the contract claims does not support jurisdiction over Essig.**

 We next consider whether the evidence demonstrates that Essig entered into a contract with Josef that was performable, in whole or in part, in Texas. or created a continuing relationship and obligations with Josef through forming a business venture to jointly commercialize and market the cauldron in Texas. The Preliminary Agreement, which is the only contract executed by the parties, expressly made Josef the sole owner of the cauldron. Josef alone assumed the acquisition, transport, and storage costs, and chose the storage location. Essig thus had no control over the cauldron's transport to or its storage in Texas following Josef's purchase.

The allegation that Essig created a continuing business relationship with Josef in Texas to sell the cauldron does not support personal jurisdiction for two reasons. First, the live pleadings of both parties deny that the parties had any agreement concerning the cauldron after the Preliminary Agreement. Second, the Preliminary Agreement nowhere mentions Texas and declares that it "only governs the transition period—according to German law." It obliged both parties to make a separate final agreement concerning details of any marketing and sale partnership "according to U.S. law." This final agreement was never executed. Consequently, Hatzenbuehler failed to show that Essig had any intention of conducting marketing and sale activities concerning the cauldron in Texas.

Any legal injury arising from Brigitte's fraud, negligent misrepresentation, and breach-of-contract causes of action against Essig occurred when Josef purchased the cauldron in Switzerland pursuant to a contract with Essig that was executed in Switzerland and governed by German law. We therefore hold that the trial court correctly granted Essig's special appearance and dismissed the case for want of jurisdiction.

**Conclusion**

We affirm the judgment of the trial court.