**Opinion issued November 5, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-18-00890-CV**

_____

**DAVID FRANKE, BRUCE NICKEL, MIKE SCHANKENBURG, KENT SCHANKENBURG, AND RICK ZIMMER, Appellants**

**V.**

**JOHAN BOLLEN, Appellee**

---

**On Appeal from the 127th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-83163**

---

### MEMORANDUM OPINION

Appellants David Franke, Bruce Nickel, Mike Schankenburg, Kent Schankenburg, and Rick Zimmer (collectively, the Investors) challenge the trial court's grant of the special appearance of appellee Johan Bollen. The Investors assert that Bollen had contacts with Texas in connection with the sale of securities

to Texas residents and that his status as a control person of an entity that engaged in securities fraud in Texas supports the exercise of personal jurisdiction over him. Because we conclude that the Investors failed to allege or provide any evidence of Bollen's purported contacts with Texas that gave rise to this litigation, we affirm the trial court's grant of Bollen's plea to the jurisdiction.

### Background

Bollen is the founder and majority shareholder in Guidewave Consulting, LLC. The Investors sued Bollen individually, Guidewave, and another Guidewave officer, Rocky Emery, alleging fraudulent inducement and securities fraud in connection with the Investors' decision to invest $495,000 in predictive technology.

In their original petition, the Investors alleged that Guidewave is a privately owned company based in Indiana, founded by Bollen in 2011 "to monetize predictive technology he developed while working at Indiana University." According to the Investors' petition, "Guidewave's technology allegedly allows it to analyze data from social media to determine a global 'mood' that can predict trends or outcomes including, but not limited, to financial markets, political elections, and major world events."

The Investors alleged causes of action for fraudulent inducement and securities fraud against Guidewave, Bollen, and Emery, stating that the Guidewave parties:

> jointly and severally represented, among other things, that: (1) Guidewave's social media analytics could make reliable and consistent predictions regarding movements in the financial markets, political elections, and major world events; and that (2) KPMG was going to be a 50% investor in Guidewave, which would make Guidewave a billion dollar company; and (3) that the [Investors] would earn a substantial return on their investment."

The Investors asserted that the Guidewave parties knowingly or recklessly made these material and false representations and that the Investors relied on the misrepresentations "in their decision to invest approximately $495,000.00, and suffered financial harm as a proximate cause of the false representations."

The Investors further alleged that Bollen and Emergy "were the majority members and beneficial owners of Guidewave" and "[c]aused Guidewave to be used for the purpose of perpetrating and did perpetrate an actual fraud on [the Investors] for the direct personal benefit of themselves and are personally liable under the common law" and Business Organizations Code sections 101.002 and 21.223(b). And they alleged that because the Guidewave parties' "conduct relates to the sale of a security, their fraudulent conduct constitutes securities fraud."

The Investors did not specifically identify any statements by Bollen, made either directly or indirectly, that they relied upon. Nor did the they identify the

3

nature of their investment with Guidewave. It appears from the record that the Investors actually invested money in a third company—Predictor Technology Corp.—but that company is not a party to this lawsuit, and the Investors do not explain the relationship, if any, between Predictor and Guidewave or Bollen. The Investors alleged only that Guidewave at some point approved Emery's transfer of a portion of his own interest in Guidewave to them, without explaining when or how they paid for such a transfer. Rather, the Investors alleged the following facts in support of their fraud claims:

- Emery "was not only an investor and company officer in Guidewave, but was authorized by Guidewave and [Bollen] to solicit other investors for the purpose of raising capital to fund Guidewave's operations."

- The Investors were contacted by Emery on Guidewave's behalf in February 2014 because Emery wanted them to invest in Guidewave.

- Emery "made representations with a particular emphasis on Guidewave's purported ability to predict movements in financial markets" and Bollen "conferred with [the Investors] about Guidewave's technology and uses." Emery "for his own benefit and that of Guidewave, secured signed buy/sell agreements with" the Investors.

- The Guidewave parties used "sales tactics" that included sending the Investors Guidewave's newsletter, "as well as hand-picked 'Guidewave Alerts' and 'Guidewave Indicators of the Day,' which purported to show how closely Guidewave predicted market movements, but always after the predictions had come true."

- Emery represented "that KPMG had expressed an interest in acquiring as much as 50% of Guidewave, which, according to Mr. Emery, would '. . . make [Guidewave] a billion dollar company. . . .'"

4

- Emery became Guidewave's chief operating officer with a 35% ownership interest in June 2014 and "immediately agreed to sell a portion of his 35% interest in order to help capitalize Guidewave."

- Investors "understood that their investment equated to a 9.9% ownership interest in Guidewave" collectively and that their total investment was $495,000.

- "In June 2014, the [Investors] became suspicious that something was amiss. More specifically, by this time period, none of the [Investors] had received membership certificates or any other documentation showing that they were members of Guidewave. This was particularly worrisome because several of the [Investors] had reached out to Mr. Emery asking for such documentation. Mr. Emery would always assure those who inquired that the documents would be forthcoming."

- Emery resigned his position as Guidewave's COO in December 2014 "because he planned to form a hedge fund using Guidewave's analytics." Emery "divested himself of his interest in Guidewave" by transferring his units to Bollen, "ostensibly to avoid any appearance of a conflict of interest." Thus, Bollen became a 79.4% owner of Guidewave.

- "To this day none of the [Investors] has ever received any income or dividends from his investment in Guidewave. Nor has any [Investor] received any tax returns, K-1s, bank statements or other forms of financial information that an owner would commonly receive."

Bollen filed a special appearance that he supported with his sworn declaration. Bollen asserted that he is a resident of Indiana, does not maintain a residence, office, or place of business in Texas, does not do business in Texas, and is neither required to nor does he actually maintain an agent for service of process in Texas. Bollen further alleged that he does not "own, rent, lease, or hold any other interest in any real or personal property located in the State of Texas"; he does not maintain any bank accounts in Texas; he does not advertise within Texas;

5

and he "has never sued anyone in the state or federal courts in Texas and has only been sued once in Texas: in this lawsuit."

Regarding the specific allegations of the Investors, Bollen asserted that he did not, "in an individual capacity," authorize Emery or anyone else "to solicit investors for the purpose of raising capital to fund [Guidewave's] operations." Bollen acknowledged that, in June 2014, Guidewave authorized Emery to sell a portion of the membership units owned by Emery himself, but neither Guidewave nor Bollen authorized Emery to make any misrepresentations, nor were they "aware of any such misrepresentations having been made by [Emery] or anyone else." Bollen further alleged that he did not personally "direct any Guidewave newsletters, 'Guidewave alerts' or 'Guidewave Indicators of the Day'" to the Investors, and he asserted that he had "no recollection of having ever met or spoken to" the Investors, and he has never had any business of personal dealings with the Investors.

Bollen stated that "it is possible that I participated in a web conference in which one or more of the [Investors] participated, but if I did, I have no recollection of it" and "would have attended any such web conference from the State of Indiana." Bollen stated in his special appearance that his "only connection with the state of Texas are two trips to Texas in 2014 for meetings with John Mauldin and representatives from KPMG [who are not parties to the underlying

suit] and one trip to Texas in 2012 to speak at the South by Southwest Conference in Austin."

In their response to Bollen's special appearance, the Investors argued that Bollen has minimum contacts with Texas. They asserted that he had the following contacts with Texas:

- "Bollen directed and participated in recruiting Texas investors." He "made a presentation in an interactive web conference in February 2014, which was intended to explain to several Texas residents [Guidewave's] predictive technology" and that the Texas residents included Franke (one of the Investors in this suit) and two other Texas residents who are not parties to this suit.

- In June 2014, Bollen, "as the majority owner of Guidewave, approved a motion to permit [Emery] to raise capital for Guidewave."

- In June or July 2014, Emery organized a trip to Houston during which "Bollen attended between six (6) and twelve (12) meetings with a total of approximately twenty (20) potential investors including, but not limited to KPMG, Glaw, and Casey, among others."

- Later in 2014, Bollen "issued or caused to be issued ownership certificates" indicating that the Investors collectively owned 9.9% of Guidewave.

- "Bollen personally engaged in marketing efforts by making national media appearances promoting both himself and his technology," including an appearance on Fox News that aired on February 2, 2015.

The Investors also asserted that Bollen "is a control person as defined" in the Texas Securities Act, and they argued that "personal jurisdiction may be found

7

where a defendant takes part in any aspect of a tortious scheme that impacts Texas citizens, regardless of a defendant's other links to this State."

The Investors also provided some evidence in support of their response to Bollen's plea to the jurisdiction. Emery made a declaration that he participated in an interactive web conference in February 2014 and that one purpose of the conference was to present to the Investors "how Guidewave's technology could analyze social media . . . and then be used to make predictions about certain events." Emery stated that the web conference was attended by "some of the Texas [Investors]" in addition to other Texas residents who were "evaluating Guidewave as a potential investment for themselves and/or their clients."

Emery further declared that "[s]hortly after the February 2014 conference, the [Investors] invested in a company called Predictor Technology Corp. The [Investors'] interest in Guidewave was acquired later in 2014." He stated that, in June or July 2014, Bollen came to Texas for a series of meetings with "potential investors and/or buyers of Guidewave," including KPMG and other individuals who are not parties to this suit, and Emery stated, "Any buyer's acquisition of Guidewave would have included a sale of Bollen's individual interest in Guidewave." Emery also declared that Bollen "made multiple media appearances that reached viewers in Texas, and which promoted his technology," including but not limited to the February 2, 2015 interview on Fox News. Emery "mentioned

8

Bollen's Fox News appearance in an email sent to [some of the Investors] on February 4, 2015." And Emery stated that "Bollen used the interview as one, among many, efforts to create an individual media persona known as the Twitter Predictor." Emery stated that in the fall of 2014, "as the majority owner of Guidewave, [Bollen] personally approved that the [Investors] would receive a collective 9.9% ownership interest in Guidewave" that was transferred from Emery's own interest in the company.

The Investors also supplied the declaration of Investor David Franke. He stated that he participated in the February 2014 interactive web conference, which was attended by other Texas residents who were not parties to this suit. Franke and the other investors "invested in a company called Predictor Technology Corp" shortly after the February 2014 conference and then "acquired" their interest in Guidewave "later in 2014." Franke further declared that Bollen met with people in Texas, but he did not allege that he personally met with Bollen. Rather, Franke stated, "From my discussions with Rocky Emery, I understood that the purpose of the KPMG meeting was to see if KPMG would either buy Guidewave and its technology, invest in Guidewave, or encourage one or more of its clients to invest in Guidewave."

Franke further stated, "I understand from Rocky Emery that other meetings occurred between Bollen and Texas residents, including further discussions with

9

KPMG, regarding possible investment in Guidewave." Franke also mentioned Bollen's "multiple media appearances that reached viewers in Texas, and which promoted his technology." He specifically mentioned the February 2, 2015 interview on Fox News and stated that he and his fellow Investors "learned of Bollen's interview from a February 4, 2014 email that we received from Rocky Emery."

Franke further stated, "In or about October 2014, Rocky Emery sent me information that appeared to confirm that Bollen, as the majority owner of Guidewave, personally approved that the [Investors] would receive a collective 9.9% ownership interest in Guidewave." The attached email was sent on October 29, 2014, from Emery, and copied Bollen. It stated, "Here are your certs and the agreement with IU and CAP Table as of 10/29/2014[.] I will send operating agreements later. Thanks for your patience and support as always. . . . Will get originals of everything to you when we have lunch again. Let me know some dates that work." The attached "table" of ownership interest showed that the transfer of ownership to the Investors was made from Emery's interest in Guidewave. The emails also included Guidewave's certificate of organization, articles of incorporation, and "LLC Membership Certificates" in Guidewave for each Investor according to his percentage interest in the company.

The Investors also provided Guidewave's "special meeting minutes" from the June 15, 2014 meeting in which Bollen, as "the chairperson of the meeting," conducted business including hiring Emery as COO in exchange for 35% of Guidewave's membership units. The minutes also reflected that Emery "agreed to sell some of his units in order to capitalize [Guidewave]." And the minutes included a "CAP TABLE AS OF 6/15/2014" reflecting the Investors' interest in Guidewave. These minutes were signed by Emery, but not by Bollen. The Investors also provided special meeting minutes from the December 31, 2014 meeting in which Emery stepped down from the Guidewave Board and agreed to transfer his ownership interest in Guidewave to Bollen. These minutes were signed by Emery and Bollen.

Bollen replied in support of his special appearance, pointing out that there were no allegations that he personally had ever met or dealt with the Investors. He asserted:

> In fact, the Investors did not invest in [Guidewave]. Rather, on February 26, 2014, the [Investors] invested their money in a company called Predictor Technologies Corp. ("Predictor"). In this regard, the [Investors] executed agreements for the purchase of shares in Predictor in which they [acknowledged that no statements, representations, or warranties had been made or furnished to them by the "Company" or any person acting on behalf of the "Company"] [and] [e]ach of the agreements was addressed to Rocky and Julie Emery and the funds were to be transmitted to the Attorney Escrow account of Mintz & Faraade, P.C.

11

Bollen asserted that the Investors' response to the special appearance "acknowledge[d] that their investments in February 2014 were in Predictor," not Guidewave.

Bollen further asserted that, although the Investors asserted and provided statements indicating that at least one of them participated in the February 2014 web conference, they have not asserted or demonstrated that Bollen participated in that conference. He asserted that the Investors pleaded generally that Bollen made misrepresentations to them in connection with their investment, but they failed to present evidence of any such misrepresentation and have "wholly fail[ed] to articulate, in any way, the factual basis for any claims against Bollen, including any claims for common law or securities fraud." Finally, Bollen argued that the Investors did not provide any evidence of what Bollen allegedly said in his February 2015 Fox News interview "or how what he said could have impacted their decision to make financial investments [in] 2014." Bollen attached four purchase agreements between individual Investors and Emery to purchase shares in Predictor Technologies Corp. These agreements indicated that four of the Investors paid a total of $250,000 for the Predictor stock. There was no evidence from any source, nor even any pleadings, indicating with whom or for what consideration the remaining alleged investments occurred. Nothing in the pleadings or evidence

12

explains the nature of the relationship, if any, between Predictor and Bollen or Guidewave.

The trial court granted Bollen's special appearance and dismissed all of the claims against Bollen. The trial court subsequently signed findings of fact and conclusions of law that Bollen is a resident of Indiana and has not had any dealings or contacts with Texas except for two trips to Texas in 2014 for meetings with third parties and a meeting in 2012 to speak at a conference in Austin. The trial court found that Bollen "did not personally direct any Guidewave newsletters" or other communications to the Investors and that "Bollen has never had any business or personal dealings with any of the [Investors]." The trial court also found that the Investors did not invest in Guidewave but instead "executed agreements for the purchase of shares in Predictor. . . ." The trial court further found that, "[a]lthough the [Investors] allege to have participated in a web conference related to [Guidewave] in February 2014, they have not alleged that Bollen also participated in that web conference" and that the "record does not contain evidence regarding the substance" of Bollen's February 2, 2015 interview with Fox News.

## Special Appearance

The Investors argue on appeal that the trial court erred in granting Bollen's special appearance given Bollen's "contacts with the State of Texas in connection

13

with the sale of securities to Texas residents" and Bollen's "status as a control person of an entity which engaged in securities fraud in Texas."

## A.    Standard of Review

Whether a court can exercise personal jurisdiction over a nonresident defendant is a question of law, and thus we review de novo the trial court's ruling on a special appearance. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). However, the trial court frequently must resolve questions of fact before deciding the jurisdiction question. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

"If a trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds," and the court may review fact findings for both legal and factual sufficiency. *Id.* We review a trial court's conclusions of law as a legal question, and, while an appellant may not challenge a trial court's conclusions of law for factual insufficiency, we may nevertheless review the trial court's legal conclusions drawn from the facts to determine their correctness. *Id.* If we determine that a conclusion of law is erroneous, but the trial court rendered the proper ruling, the erroneous conclusion of law does not require reversal. *Id.*

Texas courts may exercise personal jurisdiction over a nonresident if the long-arm statute authorizes it, consistent with federal and state constitutional due-process guarantees. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013). The long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas, and it provides a non-exhaustive list of activities that constitute "doing business," including committing a tort "in whole or in part" in Texas. *See* TEX. CIV. PRAC. & REM. CODE § 17.042(2); *BMC Software*, 83 S.W.3d at 795. Personal jurisdiction over a nonresident is consistent with due process when the nonresident has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Moki Mac*, 221 S.W.3d at 575. In most cases, the exercise of jurisdiction over a nonresident defendant will not conflict with notions of fair play and substantial justice if the nonresident has minimum contacts with the forum. *Moncrief Oil*, 414 S.W.3d at 154–55.

"A defendant establishes minimum contacts with a state when it 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The Texas Supreme Court has identified three distinct aspects of the "purposeful availment" requirement. First, only the

15

defendant's contacts with the forum are relevant, because a nonresident should not be called to court in a jurisdiction solely as a result of the unilateral activity of another party. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005). Second, the defendant's acts must be purposeful, as opposed to random, isolated, or fortuitous. *Id.* Third, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.*

A defendant's contacts can vest a court with either specific or general jurisdiction. *BMC Software*, 83 S.W.3d at 795. Specific jurisdiction requires that the claims at issue arise from or relate to the defendant's purposeful contacts with Texas. *Kelly*, 301 S.W.3d at 658. General jurisdiction, on the other hand, is predicated on the defendant's "continuous and systematic" contacts that render it "essentially at home in the forum State," irrespective of whether its alleged liability arises from those contacts. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117 (2014)).

When a defendant challenges the exercise of personal jurisdiction in a special appearance, the plaintiff and the defendant bear shifting burdens. *Kelly*, 301 S.W.3d at 658. The initial burden is on the plaintiff to plead sufficient allegations to establish jurisdiction over the defendant. *Id.* After the plaintiff meets its initial burden, the burden shifts to the defendant to negate all bases of jurisdiction alleged by the plaintiff. *Id.*

The defendant can negate jurisdiction on either a factual or a legal basis. *Id.* at 659. To negate jurisdiction on a factual basis, the defendant can "present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id.* Alternatively, the defendant can negate jurisdiction on a legal basis by showing that "even if the plaintiff's alleged facts are true," (1) the evidence is legally insufficient to establish jurisdiction; (2) the defendant's contacts with Texas do not amount to purposeful availment; (3) for specific jurisdiction, the plaintiff's claims do not arise from the defendant's contacts; or (4) the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *Id.*

## B.  General Jurisdiction

"[G]eneral jurisdiction is only present when a defendant not only has continuous and systematic contacts with the forum state, but also has these kinds of contacts to such an extent that they render it essentially at home in that state." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 72–73 (Tex. 2016); *Ruiz*, 490 S.W.3d at 37. Because general jurisdiction permits a court to exercise personal jurisdiction over a nonresident for claims not directly linked to his contacts with the state, a general jurisdiction inquiry requires a more demanding minimum-contacts analysis with a "substantially higher threshold." *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007).

17

The Investors have not provided any pleadings or evidence indicating that Bollen can be considered "essentially at home" in Texas. The uncontroverted evidence indicated that Bollen is an Indiana resident who owns no property in Texas and has only traveled to Texas on three occasions. They have not pleaded that Bollen individually does business regularly in Texas or that he maintains any kind of office or presence in the state. The Investors alleged generally that Bollen approved Emery's acts in Texas, but Emery's actions on his own behalf or on behalf of Guidewave cannot constitute contacts between Bollen and Texas. *See Michiana*, 168 S.W.3d at 785 (only defendant's contacts with forum are relevant because nonresident should not be called to court in jurisdiction solely as result of unilateral activity of another party); *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("When there are multiple defendants, the contacts of each defendant must be analyzed individually.") (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)).

Furthermore, the Investors did not provide any information regarding Bollen's, Emery's, or Guidewave's activities in their entirety to place any contacts with Texas in the proper context. "[W]ithout evidence about the full nature of [defendant]'s business and contacts with Texas as compared to other forums, the record does not support the exercise of general jurisdiction based on the presence of a single employee in Texas." *Bautista v. Trinidad Drilling Ltd.*, 484 S.W.3d

18

491, 503 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see also Brenham Oil & Gas, Inc. v. TGS-NOPEC Geophysical Co.*, 472 S.W.3d 744, 759 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Occasional travel to Texas is insufficient by itself to establish continuous and systematic contacts with the state."); *DENSO Corp. v. Hall*, 396 S.W.3d 681, 693–94 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (trips to Texas by foreign corporation personnel over ten-year period did not support general jurisdiction because evidence did not establish general business presence).

Because the Investors' allegations and the evidence do not support a finding that Bollen's contacts with Texas were so substantial that he was "essentially at home" in Texas, we conclude that Bollen satisfied his burden to negate general jurisdiction on a legal basis. *See Kelly*, 301 S.W.3d at 659.

## C.    Specific Jurisdiction

For a Texas court to exercise specific jurisdiction over Bollen, two things are required: Bollen's Texas contacts must have been purposeful, and the Investors' claims for fraudulent inducement and securities fraud must arise from those contacts. *See Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 559 (Tex. 2018); *Michiana*, 168 S.W.3d at 795.

Our analysis centers on Bollen's actions and choices to enter the State of Texas and conduct business, as opposed to his contacts with Texas residents. *See*

*Old Republic*, 549 S.W.3d at 561 ("[A] proper minimum-contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there."); *Searcy*, 496 S.W.3d at 76 ("[T]he proper focus is on the quality of the defendant's contacts with the forum, as opposed to the residence of the plaintiff."). In other words, we consider only Bollen's contacts resulting from his own "efforts to avail [himself] of the forum." *Ruiz*, 490 S.W.3d at 38 (quoting *Moki Mac*, 221 S.W.3d at 576).

The record does not contain evidence of any Texas contact by Bollen that could give rise to the Investors' claims for fraudulent inducement or securities fraud. *See Old Republic*, 549 S.W.3d at 561; *Searcy*, 496 S.W.3d at 76. There is no indication that Bollen made any representations to the Investors before their February 2014 investment with Predictor. There is no evidence of any relationship between Bollen individually and Predictor. There is no evidence that the Investors paid any money to Bollen personally or that Bollen benefitted—either personally or as a principal of Guidewave—from any payments that the Investors made to Predictor through Emery.

The Investors point to their evidence regarding the February 2014 interactive web conference. They argue that the declarations of Emery and Franke undermine Bollen's assertions that there is no evidence that he participated in the web conference and that there is no evidence of the content of the web conference. But

20

nothing in either Emery's or Franke's declaration indicated that Bollen himself participated in the web conference. Franke's declaration stated,

> I participated in an interactive WebEx conference. One purpose of the web conference, among others, was to present to the [Investors] how Guidewave's technology could analyze social media, such as Twitter and Facebook, and then be used to make predictions about certain events, including, but not limited to, the financial markets, politics, and major world events. . . .

> The persons from Texas who attended the February 2014 web conference included not only some of the Texas [Investors], but other Texas residents [who are not parties to this lawsuit]. I understood that the [third parties] were evaluating Guidewave as a potential investment for themselves and/or their clients.

Emery's statement on this issue was substantively identical. Nothing in either statement asserts that Bollen participated in the conference. Neither statement identifies any misrepresentation by Bollen or other action that could have contributed to the Investors' subsequent decision to invest in Predictor. Furthermore, electronically transmitting an allegedly fraudulent or negligent misrepresentation to a Texas resident does not constitute the commission of a tort in Texas and therefore does not establish specific jurisdiction. *11500 Space Ctr., L.L.C. v. Private Capital Grp., Inc.*, 577 S.W.3d 322, 331–32 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *cf. Michiana*, 168 S.W.3d at 791 ("[C]hanges in technology have made reliance on phone calls obsolete as proof of purposeful availment."); *Chameli v. Fla. Gas Transmission Co. LLC*, No. 01-17-00823-CV, 2018 WL 3059732, at *6 (Tex. App.—Houston [1st Dist.] June 21, 2018, no pet.)

21

(mem. op.) (defendant's email and phone communications, including alleged misrepresentation, to plaintiffs in Texas did not alone constitute minimum contacts); *Majors Mgmt., LLC v. Price & Co.*, No. 09-17-00063-CV, 2018 WL 771008, at *7–8 (Tex. App.—Beaumont Feb. 8, 2018, no pet.) (mem. op.) (no purposeful availment where all of nonresident defendant's contacts with plaintiff were through telephone calls, email messages, and wire transfers); *Hatzenbuehler v. Essig*, 526 S.W.3d 657, 665 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (telephone calls and emails alleged to contain misrepresentations were "not sufficient to establish that [defendant's] alleged tortious acts were directed to Texas" because "[t]he Supreme Court of Texas has specifically rejected telephone calls, without more, as a basis for establishing personal jurisdiction based on a tort committed in the state").

The Investors also point to the meetings between Bollen and Texas residents in June and July 2014. Nothing in the record indicates that Bollen met with any of the Investors who are a party to this suit. Nothing indicates that Bollen ever made any representations to the Investors about his meeting with KPMG or other investors. The Investors do not cite any facts indicating how Bollen's meetings with third parties—meetings that occurred months after the Investors paid Emery for shares of Predictor—formed the basis of this suit. "[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there

22

must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. The Investors have not shown any connection between Bollen's 2014 meetings and the operative facts of this litigation. *See id.*

The Investors also asserted that Bollen issued or caused to be issued ownership certificates indicating the transfer of some of Emery's interest in Guidewave to the Investors, thus giving the Investors a 9.9% interest in Guidewave. Nothing in the pleadings or evidence, however, indicates that the Investors paid money to Guidewave in connection with this transfer. Nothing in the pleadings or evidence indicates that Bollen himself received a benefit from this transfer or that Bollen availed himself of doing business in Texas by approving the transfer. *See Retamco Operating*, 278 S.W.3d at 338 (defendant establishes minimum contacts with forum state by "purposefully avail[ing] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws"); *Michiana*, 168 S.W.3d at 785 (contacts must be purposeful, as opposed to random, isolated, or fortuitous, and defendant must seek some benefit, advantage, or profit by availing itself of forum state's jurisdiction). The record demonstrates only that the Investors paid Emery in connection with a company called Predictor, and Emery later transferred some of his interest in Guidewave with approval from Guidewave's board, on which Bollen serves.

23

Likewise, there are no pleadings or explanation of how this transaction gave rise to the Investors' claims for fraudulent inducement or fraud in connection with a sale of securities against Bollen. *See Kelly*, 301 S.W.3d at 659 (specific jurisdiction requires that claims at issue arise from or relate to defendant's purposeful contacts with Texas).

Finally, the Investors point to Bollen's "multiple media appearances" but specifically mention only the February 2, 2015 appearance on Fox News to discuss his technology's ability to predict terror attacks. They argue that these appearances reached Texas residents, including the Investors themselves. Franke's declaration indicates that he was made aware of the appearance two days after it occurred when Emery forwarded a link to the interview by email two days later. Again, however, the Investors have not shown any connection between this purported contact and the operative facts of this litigation. Nothing in the pleadings or evidence identified any particular statement made by Bollen during this presentation that could support the Investors' fraud claims, and there is no explanation for how Bollen's 2015 interview could have fraudulently induced the Investors to invest in Predictor in the previous months. *See id.*

The Investors have not pointed to any contacts between Bollen and Texas that could form the basis of their fraudulent inducement or securities fraud claims. *See Old Republic*, 549 S.W.3d at 561; *Searcy*, 496 S.W.3d at 76. Accordingly, the

24

trial court properly concluded that it could not exercise specific jurisdiction over Bollen. *Kelly*, 301 S.W.3d at 659 (defendant can negate jurisdiction on legal basis by showing that even if plaintiff's alleged facts are true, defendant's contacts with Texas do not amount to purposeful availment).

## Conclusion

We sustain the trial court's grant of Bollen's plea to the jurisdiction.


Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.