In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-23-00201-CV**

**THEODORE OSHMAN, OSHMAN FIRM, LLC, AND
OSHMAN & MIRISOLA, LLP, Appellants**

**V.**

**RICHARD WILKISON, INDIVIDUALLY AND ON BEHALF
OF THE ESTATE OF CODY WILKISON, DECEASED, Appellee**

_____

**On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 22-09-12453-CV**
_____

**MEMORANDUM OPINION**

This interlocutory appeal pertains to a special appearance wherein the Defendants, Appellants Theodore Oshman, Oshman Firm, LLC, and Oshman & Mirisola, LLP (hereinafter collectively "Defendants" or "Appellants"), alleged that the trial court lacked personal jurisdiction over the legal malpractice claims filed against them by Plaintiff, Richard Wilkison, individually and on behalf of the estate of his son, Cody. According to Wilkison, he contacted the Defendants to pursue

1

Wilkison's claims, individually and on behalf of Cody's estate, arising from Cody's death due to the use of mitragynine, an herbal extract (a/k/a "Kratom"). Wilkison filed a petition in Montgomery County, Texas, district court, asserting claims against the Defendants for legal malpractice, negligence, breach of fiduciary duty, and violations of the Deceptive Trade and Practices Act. The Defendants filed a special appearance challenging specific jurisdiction. After a hearing, the trial court granted the special appearance. Wilkison filed a Motion for Reconsideration, a Notice of Appeal, and a Motion for New Trial. The trial court granted the motion to reconsider, held a hearing on the motion, vacated its prior order granting the special appearance, and entered a new order denying the special appearance. The Defendants timely filed an interlocutory appeal. Because we conclude that the Appellants' contacts with Texas were insufficient to purposefully avail themselves of the privilege of conducting activities here, the trial court lacked personal jurisdiction over the Appellants. We reverse the trial court's order denying Appellants' special appearance and dismiss Appellee's claims against Appellants for lack of personal jurisdiction.[1]

---

[1] Wilkison concedes that the trial court lacks general personal jurisdiction over the Defendants. Therefore, the only jurisdictional issue present in this case is whether the trial court could exercise specific personal jurisdiction over Defendants.

Background

In Wilkison's petition,[2] he alleged that on November 28, 2018, his son, Cody, died at his home in Conroe, Texas. According to the petition, Cody had consumed mitragynine or Kratom which is commercially available in Texas, and the autopsy stated the cause of Cody's death as "[a]cute toxic effects of mitragynine." Wilkison alleged that both he and his son, Cody, resided in Montgomery County, Texas, and that Defendant Theodore ("Ted") Oshman resided in Florida, Defendant The Oshman Firm, LLC is a foreign limited liability company organized and existing under the laws of New Jersey, and Defendant Oshman & Mirisola, LLP is a foreign limited liability partnership organized and existing under the laws of New York. Wilkison alleged that the Defendants represented through their website that they handle personal injury and death cases related to Kratom use, that the Defendants file lawsuits pertaining to Kratom consumption, and that they litigate in all fifty states according to this statement on their website:

> The Oshman Firm was founded over 35 years ago on a commitment to service and excellence in all aspects of practicing law. Today, we provide the same level of service to those in need in all 50 states.

According to the petition, on or about June 5, 2019, Wilkison completed and submitted the "Free Case Evaluation" form that appears on the Defendants' website,

[2] In this memorandum opinion, we refer to Wilkison's First Amended Petition as the "petition" because it was the live petition at the time the trial court signed the order denying the special appearance.

3

Defendants subsequently asked him to complete other documents including the "Kratom Questionnaire" (which Defendants allegedly referred to as the "Kratom Case Sign Up" document) and a medical release authorization form. The petition states that Wilkison also provided documents to the Defendants related to Cody's death, including the autopsy identifying Kratom as the cause of death. According to the petition, the Defendants let the statute of limitations in Texas expire on Wilkison's wrongful death cause of action and did not notify Wilkison of their decision not to pursue the wrongful death case until June 13, 2022, one year and six months after the statute of limitations had expired. Wilkison alleges that despite the Defendants' representations regarding their nationwide practice and work in Kratom cases, Wilkison learned from discovery that the Defendants do not handle Texas cases and have never been counsel of record in a Kratom case.

Defendants filed a Special Appearance, Objection to Personal Jurisdiction and Original Answer Subject Thereto, generally denying Wilkison's allegations and challenging the trial court's personal jurisdiction over the Defendants. The Defendants alleged in their Special Appearance that they are not amenable to process issued by Texas courts, and the Defendants allege they are not subject to the jurisdiction of Texas courts because the Defendants:

> (a) are not residents of Texas and are not required to maintain, nor do they maintain, a registered agent for service in Texas;
> (b) have not engaged in business activities or conduct that would subject them to jurisdiction in Texas;

4

(c) have not done business in Texas within the meaning of Tex. Civ. Prac. & Rem. Code § 17.042;

(d) have not committed any torts, in whole or in part, in Texas;

(e) do not maintain a place of business in Texas and have never maintained offices or any other type of facility in Texas;

(f) do not own any real property in Texas;

(g) do not maintain any bank accounts, telephone numbers or post office boxes in Texas; and

(h) do not engage in any marketing or advertising directed towards Texas residents.

According to their Special Appearance, the Defendants are foreign residents with insufficient "minimum contacts" with Texas, the Defendants have not undertaken or established general or specific contacts that would justify the trial court's exercise of personal jurisdiction, the Defendants did not expect to be sued in Texas based on the legitimate activities they were conducting outside that state, it is not reasonable for the Defendants to have anticipated being hauled into a Texas court on Wilkison's allegations, and the trial court's assumption of jurisdiction over the Defendants would violate Texas and federal law because it would offend traditional notions of fair play and substantial justice and deprive the Defendants of due process guaranteed by the Fourteenth Amendment of the United States Constitution.

The Defendants filed a Brief in Support of Special Appearance, and Objection to Personal Jurisdiction, with exhibits attached as evidence in support of their argument that the Defendants lacked the requisite "minimum contacts" with the State of Texas, and they subsequently filed a Supplement to Their Brief in Support

of Special Appearance with a supplemental affidavit of Theodore Oshman.[3] The Defendants argued in their Brief in Support of Special Appearance that the HIPAA Authorization itself shows that it did not create an attorney-client relationship because the attorney information section was never filled in with their information identifying them as Wilkison's counsel. As for purposeful availment, the Defendants argued that Wilkison cannot establish specific jurisdiction over Defendants because Wilkison's causes of action do not arise out of legal representation purposely directed to Texas and, as set out in Oshman's affidavit, Defendants do not reside in Texas, do not have a principal place of business in Texas, Oshman and the lawyers in the Oshman Firm or Oshman & Mirisola are not licensed to practice in Texas state or federal courts, the Defendants do not file cases in Texas, and that when the Defendants have occasionally represented Texas residents in the past those matters were handled and filed outside of Texas. According to the Defendants' Brief in Support of Special Appearance, Oshman's affidavit also established that the Defendants never mailed Wilkison any documents, the Defendants only

---

[3] Wilkison filed a motion to strike Oshman's original and supplemental affidavits on the bases that they are "sham affidavits" contradicted by Oshman's earlier sworn statements and because portions of each affidavit are too vague and ambiguous to constitute competent evidence. At the time the trial court denied the special appearance, the trial court had not ruled on the motion. Because the alleged contradiction concerning the date Oshman notified Wilkison that he would not be accepting the case is not relevant to our analysis, we need not address Wilkison's "sham affidavit" objection.

6

communicated via email and telephone with Wilkison, Defendants never noticed or attended any depositions or meetings for Wilkison in or outside Texas, and the Defendants do not advertise locally or conduct business in Texas. The Defendants further argued that while they deny ever agreeing to represent Wilkison, even if they had, the mere act of contracting with a Texas resident does not give rise to specific jurisdiction in Texas because performance must be due in Texas. According to the Defendants, neither the fact that Wilkison submitted an inquiry through the Oshman Firm's website nor the fact that Oshman researched Texas law supports specific jurisdiction. The Defendants asserted that the exercise of jurisdiction would offend the traditional notions of fair play and substantial justice under these facts.

Wilkison filed a Response to Defendants' Special Appearance, and he argued that after his son's death he turned to the Defendants for legal representation regarding the wrongful death of his son, and that the Defendants claim on their website to have experience in Kratom-related litigation and claim to handle cases in all fifty states. According to the Response, Wilkison signed the documents that the Defendants sent to him, including a document the Defendants internally called the "kratom case sign up" and a medical authorization that would designate Defendants as Plaintiff's attorneys for the purpose of reviewing Cody's medical records. Wilkison also alleged that he had conversations about his case with Ted Oshman and that Oshman and Wilkison communicated through text on their cell phones.

7

Wilkison attached as exhibits to his response his sworn declaration, pleadings in the case, Defendants' discovery responses, text and email communications between Wilkison and Oshman, printed portions of the Oshman Firm's website, the "Kratom Questionnaire" Wilkison completed and submitted to the Defendants, information about the alleged seller of the Kratom consumed by Cody, the HIPAA authorization form in the case, and Cody's autopsy report. The Defendants filed a Reply Brief in Support of Special Appearance, and an Objection to Plaintiff's Evidence Attached with His Response to Special Appearance.[4]

The trial court held a hearing and initially granted Defendants' Special Appearance. Wilkison filed a Motion for Reconsideration, arguing that the Defendants failed to meet their burden to negate all bases of jurisdiction, that Oshman's affidavit stating that the Defendants declined Wilkison's case on at least two occasions in early 2020 was a sham affidavit objected to by Wilkison because it contradicts discovery responses, and that the evidence does not support the Defendants' argument that the lawsuit did not have to be brought in Texas. Wilkison also filed a Motion for New Trial asserting the same arguments. In a supplement to his Motion for Reconsideration, Wilkison argued that under the rationale in *LG Chem America, Inc. v. Morgan*, 670 S.W.3d 341 (Tex. 2023) (hereinafter "*LG*

---

[4] At the time the trial court denied Defendants' Special Appearance, it had not ruled on Defendants' objections to Wilkison's evidence attached to his response to the Special Appearance.

*Chem*"), Defendants' intent behind their contacts with Wilkison or whether they intended to represent Wilkison is not relevant for purposes of ruling on their special appearance.

The Defendants filed a Response to Plaintiff's Motion for Reconsideration and a Brief Regarding the *LG Chem* Case. The Defendants allege that in Wilkison's Motion for Reconsideration he confuses the burden of proof, Wilkison's sham affidavit arguments lack merit, and the cases Wilkison relied on in his Motion for Reconsideration and at the hearing on the motion, including *LG Chem*, are factually distinguishable from the present case and inapplicable.

After the hearing on Plaintiff's Motion for Reconsideration and Motion for New Trial, the trial court signed an Order Granting Motion for New Trial and Denying Special Appearance (the "Order"). The Order states that the trial court had previously granted the Special Appearance "principally based upon the fact that the purported act of malpractice involved Defendants not filing a lawsuit on behalf of Plaintiff . . . [which] evidenced that Defendants deliberately chose not to do business in Texas." The Order states that both purposeful availment and relatedness for specific jurisdiction purposes "seem lacking when Defendants make a deliberate decision to terminate the relationship[,]" and that the malpractice claim is based on the Defendants' decision not to represent Wilkison without notifying him in time to find another lawyer prior to the expiration of the statute of limitations. In its

reconsideration and decision to deny the Defendants' Special Appearance, the trial court states it relied on *LG Chem* and stated in the Order that, in light of *LG Chem*, "[t]aking the intent issue out of the debate changes everything here[,]" and the trial court had reconsidered the significance of the Defendants' withdrawal from the relationship with Plaintiff, and "given the nature of [Defendants'] contact with this Texas resident about this Texas matter, Defendants should have been on notice that they could be subject to Texas' jurisdiction." The trial court specified in its Order the following as significant in ruling on the special appearance:

- Defendants communicated with Plaintiff by telephone and in writing on numerous occasions, all while Plaintiff was in Texas and for the purpose of representing this Texas Plaintiff.
- Defendants sent paperwork to Plaintiff in Texas to further the representation. That paperwork, executed in Texas, gave Defendants access to information in Texas in order to evaluate the case regarding the death of a Texas resident in Texas using a product obtained in Texas.
- Defendants indicated that they were planning to represent this Texan Plaintiff in a lawsuit. That lawsuit would likely have been filed in Texas, though this is a point which Defendants dispute, noting that the lawsuit was not required to be filed in Texas. Regardless of where the lawsuit would likely have been filed, Texas law would apply to this lawsuit, and discovery activities – document gathering, depositions, witness interviews, and the like – would be conducted in Texas with Texans. Indeed, the documents Defendants gathered while doing their litigation evaluation were gathered via the written consent of this Texas Plaintiff, which was sent to him in Texas, signed by him in Texas, and returned from him to Texas. All of the documents Defendants requested and obtained (*e.g.*, the death certificate, the autopsy report) were from the State of Texas.

In the Order, the trial court explained that the relationship and obligation between the Defendants and Wilkison when the Defendants began evaluating a lawsuit as the attorneys for this Texas client form the basis of the lawsuit – "namely, failing to file the lawsuit and allowing limitations to run." The trial court also indicated it relied on *Cartlidge v. Hernandez*, 9 S.W.3d 341, 347-49 (Tex. App—Houston [14th Dist.] 1999, no pet.). The trial court stated, "even if they never intended to contract with or to file any lawsuit for this Texas Plaintiff, [the Defendants' actions] are enough to put Defendants on notice that they might be hailed into a Texas court related to any claims about that relationship and those obligations." Ultimately, in its Order granting Wilkison's motions for reconsideration and new trial and denying the Defendants' Special Appearance, the trial court reasoned:

> Now that the Supreme Court has made clear that Defendants' intention – their ultimate declination – is not at issue, the outcome must change. Only Defendants' actions matter, and their actions are sufficient to show minimum contacts with Texas. As in *LG Chem*, by advertising their services, claiming they represent clients in all 50 states, and by accepting and engaging in a relationship with a Texas client regarding legal representation, these Defendants "purposefully availed themselves of Texas and have enjoyed the benefits and protection of Texas laws . . . . Texas's enforcement of the [D]efendants' reciprocal obligation to ensure that its [representation will not cause economic harm to] Texas citizens can 'hardly be said to be undue.'" *LG Chem*, [670 S.W.3d at 350]. That is particularly so where, as here, Defendants could have "structure[d] their Texas-directed conduct to avoid exposure to [this] lawsuit[]" [*Id.*] by simply not reviewing this Texan's case.
>
> Negotiating to take a Texas resident's case, characterizing him as a client in internal documentation, and gathering data to prepare the lawsuit and/or to determine whether to take the lawsuit are enough for

11

Defendants to have created an attorney-client relationship with this Texas resident, and those actions are sufficient for this Court to exercise jurisdiction even though Defendants never filed the lawsuit. As in *LG Chem*, it would not violate due process for Texas to exercise personal jurisdiction over Defendants when Plaintiff was injured by the very relationship which Defendants advertised to and then formed with this Texas Plaintiff, especially when that relationship was based upon the allegedly tortious death of a Texas resident in Texas via a product provided to him in Texas.

The Defendants timely filed this interlocutory appeal.

## Issue on Appeal

In one appellate issue, the Defendants argue that the trial court lacks personal jurisdiction over them, and the trial court erred in denying their Special Appearance. Specifically, Defendants argue that the trial court's denial of the Special Appearance based on Oshman's (a non-Texas attorney) communications with Wilkison (a potential Texas client) and the trial court's conclusion that it was foreseeable that the potential Texas client would be harmed in Texas by Oshman's poor performance or non-performance "contradicts Texas Supreme Court authority establishing that jurisdiction is not conferred through the out-of-state commission of a tort even when the effects or impact of that tort are foreseeable within Texas."[5]

---

[5] Citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790 (Tex. 2005).

12

Standard of Review

A nonresident defendant may challenge a Texas court's personal jurisdiction over the defendant by filing a special appearance. Tex. R. Civ. P. 120a. Whether a trial court has personal jurisdiction over a nonresident defendant is ultimately a question of law that we review de novo. *LG Chem*, 670 S.W.3d at 346; *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). The plaintiff has the initial burden of pleading sufficient allegations to bring a nonresident defendant within the jurisdiction of a Texas court. *LG Chem*, 670 S.W.3d at 346; *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149; *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009); *Booth v. Kontomitras*, 485 S.W.3d 461, 476 (Tex. App.—Beaumont 2016, no pet.). If the plaintiff meets this initial burden, the defendant then bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff. *See LG Chem*, 670 S.W.3d at 346 (citing *Kelly*, 301 S.W.3d at 658). The defendant may negate the jurisdictional allegations on either a factual or legal basis. *Kelly*, 301 S.W.3d at 659. Where relevant facts are undisputed, as here, we only consider the legal question whether the undisputed facts establish Texas jurisdiction.[6] *See Old Republic Nat'l*

---

[6] Although the date Oshman notified Wilkison that he was not accepting the case is disputed, that fact is irrelevant to the jurisdictional analysis.

13

*Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). When reviewing the plaintiff's jurisdictional allegations, we ask only whether the allegations are sufficient to invoke the exercise of personal jurisdiction over the defendant without regard to the merits of the claims. *See Booth*, 485 S.W.3d at 477.

Personal Jurisdiction Generally

"A court must have personal jurisdiction over a defendant to issue a binding judgment." *LG Chem*, 670 S.W.3d at 346 (citing *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7-8 (Tex. 2021)). Texas courts may exercise jurisdiction over a nonresident defendant as authorized by the Texas long-arm statute and when consistent with federal due-process guarantees. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041-045 (the Texas long-arm statute); *LG Chem*, 670 S.W.3d at 346; *Luciano*, 625 S.W.3d at 8. The Texas long-arm statute provides that a nonresident does business in the state if the nonresident commits certain acts in Texas, including, but not limited to, the following:

> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
> (2) commits a tort in whole or in part in this state; or
> (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

Tex. Civ. Prac. & Rem. Code Ann. § 17.042. An allegation of jurisdiction may satisfy the Texas long-arm statute, but the allegation may not satisfy the United States Constitution. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149. Therefore, even if a

14

court determines the facts satisfy the Texas long-arm statute, the court must also examine the facts to determine whether the exercise of personal jurisdiction over the defendant comports with due process. *See CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). Personal jurisdiction is consistent with due process when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Kelly*, 301 S.W.3d at 657.

Personal Jurisdiction

Whether the trial court has personal jurisdiction over a defendant is a question of law that we review de novo. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 150; *BMC Software Belg.*, 83 S.W.3d at 794-95. The plaintiff has the initial burden of pleading sufficient allegations to bring a nonresident defendant within the jurisdiction of a Texas court. *Moncrief*, 414 S.W.3d at 149; *Kelly*, 301 S.W.3d 653 at 658-59; *Retamco*, 278 S.W.3d at 337. If the plaintiff meets his initial burden, "the burden shifts to the defendant to negate all potential bases for personal jurisdiction the plaintiff pled." *Moncrief*, 414 S.W.3d at 149; *BMC Software Belg.*, 83 S.W.3d at 793. A defendant may negate the plaintiff's jurisdictional allegations on either a factual basis or a legal basis. *Kelly*, 301 S.W.3d at 658-59.

> Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the

15

trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.* at 659 (footnotes omitted). If the plaintiff does not plead facts bringing a defendant within reach of the Texas long-arm statute, the defendant need only prove that it does not live in Texas to negate jurisdiction. *Id.* at 658-59 (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982)); *Booth*, 485 S.W.3d at 476.

Asserting personal jurisdiction over a nonresident defendant comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction comports with traditional notions of fair play and substantial justice. *Retamco*, 278 S.W.3d at 338. The minimum contacts analysis requires "'some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Michiana Easy Livin' Country, Inc. v. Holten*, 168 SW.3d 777, 784 (Tex. 2005) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The focus is on the defendant's activities and expectations. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).

16

A defendant's contacts may support either general personal jurisdiction or specific personal jurisdiction. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 150; *Zinc Nacional, S.A. v. Bouché Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010). General jurisdiction arises when a defendant's contacts with the forum state are so "'continuous and systematic'" that the defendant is "'essentially at home[]'" in the forum state. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412 (Tex. 2023) (citations omitted). This kind of personal jurisdiction allows courts to render a binding judgment against a defendant even if the plaintiff's claims neither arise from activities conducted in the forum state nor "'relate to the forum [s]tate or the defendant's activity there.'" *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021)). Here, Wilkison conceded in his motion for new trial that Defendants are not subject to general jurisdiction and he stated, "[w]hile the defendants['] contacts with a forum state can give rise to general or specific jurisdiction, this case involves specific jurisdiction." Accordingly, the only question here is whether the trial court has specific personal jurisdiction over the Defendants.

Specific Personal Jurisdiction

Specific personal jurisdiction applies more narrowly than general jurisdiction. *Volkswagen Aktiengesellschaft*, 669 S.W.3d at 412-13 (citing *Ford Motor Co.*, 592 U.S. at 352). Courts can exercise specific jurisdiction over a nonresident defendant when two conditions are met: (1) the defendant engages in some act by which it

17

purposefully avails itself of the privilege of conducting activities within the forum state, and (2) the plaintiff's claims arise out of or relate to those forum contacts. *Id.* (citing *Ford Motor Co.*, 592 U.S. at 352; *Luciano*, 625 S.W.3d at 8-9); *see also Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 579 (Tex. 2007) (specific-jurisdiction analysis involves two co-equal components: purposeful availment and relatedness)). This kind of personal jurisdiction involves a "'claim-by-claim'" analysis that focuses on the relationship between the defendant, the forum state, and the operative facts of the litigation. *Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413 (quoting *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 150); *see also Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 262 (2017); *TV Azteca, S.A.B. de C.V. v. Ruiz*, 490 S.W.3d 29, 42 (Tex. 2016) (quoting *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014)). We consider the "quality and nature of [these] contacts, rather than their number[.]" *Am. Type Culture Collection*, 83 S.W.3d at 806. And we examine the Defendants' purposeful conduct and contacts with Texas, rather than another's conduct and contact with Texas. *See Walden*, 571 U.S. at 291 ("[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum State.") A substantial connection may result, however, from a single purposeful act. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 151-52.

Purposeful Availment

The first prong of specific jurisdiction, purposeful availment, is the "touchstone of jurisdictional due process[.]" *Michiana Easy Livin' Country, Inc.*, 168 S.W.3d at 784. The purposeful availment analysis asks whether "'a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there.'" *See Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413 (quoting *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 152). "To show purposeful availment, a plaintiff must prove that a nonresident defendant seeks a benefit, advantage, or profit from the forum market." *In re Christianson Air Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 679 (Tex. 2022) (citing *Michiana Easy Livin' Country, Inc.*, 168 S.W.3d at 785). We apply three considerations to determine purposeful availment:

- "[O]nly the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person";
- "The contacts relied upon must be purposeful," not "random, fortuitous, or attenuated"; and
- The defendant "must seek some benefit, advantage[,] or profit by availing itself of [Texas's] jurisdiction."

*See Volkswagen Aktiengesellschaft*, 669 S.W.3d at 413-14 (quoting *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 151). "Where the defendant has 'deliberately' engaged in significant activities within a state, he 'manifestly has availed himself of the privilege of conducting business there.'" *Luciano*, 625 S.W.3d at 9 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985)).

19

Plaintiff's Jurisdictional Allegations

"Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Kelly*, 301 S.W.3d at 658; *Brenham Oil & Gas, Inc. v. TGS-NOPEC Geophysical Co.*, 472 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2015, no pet.). In the petition, Wilkison asserted the following jurisdictional allegations:

[] The Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves of the privileges and benefits of conducting business in Texas. Defendants targeted the Texas market for their legal services, represented to the public that they handled litigation in Texas, as well as all the other states comprising the United States, communicated and contracted with Plaintiff, a Texas resident, as part of "signing up" his Kratom wrongful death case, and took specific, deliberate actions to financially profit from serving the Texas legal market and from signing up Plaintiff's wrongful death case. Defendants requested and received a medical records authorization from Plaintiff that would designate Defendants as the attorney representative for Plaintiff, authorizing Defendants to review and communicate with others regarding the health records of Plaintiff's deceased son, Cody.

[] The Court has personal jurisdiction over Defendants, nonresidents, because Defendants committed a tort, which is the subject of this suit, in whole or in part in Texas. Defendants misrepresented their background, qualifications, and capacity to represent Plaintiff. Defendants failed to timely file a lawsuit in Texas for the wrongful death of Plaintiff's son or provide proper disclosure and notification of their unwillingness to take the necessary actions to preserve Plaintiff's rights and claims pertaining to the wrongful death of Plaintiff's son.

[] The Court has personal jurisdiction over Defendants, nonresidents, because Defendants engaged in business in Texas by contracting with Plaintiff, a Texas resident, to provide legal services and legal representation to Plaintiff in connection with claims arising

20

from the wrongful death of Plaintiff's son, who was also a Texas resident. Had Defendants filed a lawsuit within the statute of limitations as Plaintiff engaged them to do, it would have been filed in Texas where all parties and all acts and omissions giving rise to Plaintiff's claims occurred.

We conclude that the allegations in the petition are sufficient to carry the Plaintiff's initial burden to plead allegations sufficient to bring the Defendants within the reach of the Texas long-arm statute. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (acts that may constitute "doing business" include "contract[ing] by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state[]" or "commit[ting] a tort in whole or in part in this state[]"); *Evergreen Media Holdings, LLC v. FilmEngine Ent., LLC*, No. 09-14-00364-CV, 2016 Tex. App. LEXIS 10395, at *16 (Tex. App.—Beaumont Sept. 22, 2016, no pet.) (mem. Op.) ("A plaintiff satisfies this minimal requirement by an allegation that the nonresident was doing business in Texas."); *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 763 (concluding that allegation that at "'all times material to this lawsuit, [defendant], was doing business in Houston, Harris County, Texas[,]'" was sufficient to carry plaintiff's initial burden to plead jurisdictional facts and shifted burden to defendant); *Huynh v. Nguyen*, 180 S.W.3d 608, 619-20 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating plaintiff's minimal pleading requirement was satisfied by allegation that nonresident defendants were doing business in Texas). Because Plaintiff met his initial burden in his petition, the burden shifted to

21

the Defendants to negate the Plaintiff's alleged bases of jurisdiction. *See Kelly*, 301 S.W.3d at 6; *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 763.

A defendant negates jurisdiction on a factual basis by presenting evidence to disprove the plaintiff's jurisdictional allegations. *Kelly*, 301 S.W.3d at 659. "The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id*. A defendant negates jurisdiction on a legal basis by showing:

> [E]ven if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id*.

Jurisdictional Challenge Made by Defendants

The burden shifted to the Defendants to negate the allegations in the petition of facts pertaining to specific jurisdiction. Defendants challenged and denied the jurisdictional allegations. Defendants attached the affidavit of Theodore Oshman as an exhibit to their special appearance, and in the affidavit he states, in addition to the allegations in Defendants' Special Appearance, the Defendants do not maintain registered agents for service of process in Texas, and Oshman, as well as the other attorneys in the Oshman Firm and Oshman & Mirisola firm, are not licensed to

practice law in Texas and have not filed any cases in Texas state or federal court. Oshman states in his affidavit that he first learned of Wilkison after receiving an email on approximately June 5, 2019, with Wilkison's contact information submitted through a web form inquiry made by Wilkison regarding Wilkison's son's death, which allegedly resulted from Cody's ingestion of Kratom. According to Oshman's affidavit, Oshman then spoke with Wilkison over the phone and Oshman advised his assistant to send Wilkson a "Kratom Questionnaire" so that he and the Oshman firm could determine if the case was a case the firm should accept. Oshman acknowledged that Wilkison sent his firm a copy of Cody's autopsy report and a HIPAA authorization, which authorized the release of Cody's medical records. In his affidavit, Oshman states that he used the information to investigate whether his firm should accept Wilkison's case, and he researched websites related to Kratom to determine whether Kratom could be legally sold in Texas. According to Oshman's affidavit, he spoke to Wilkison via telephone on at least two occasions in early 2020. In one of those conversations, Oshman states he informed Wilkison that he would not accept Wilkison's case based on his research and review of the documents and information Wilkison had provided. Oshman also stated after he told Wilkson the firm was rejecting the case, Wilkison texted him and acknowledged that Oshman would not be filing the case. According to Oshman's affidavit, at no time during any

23

telephone calls or email communications with Wilkison was he present in the state of Texas. In a supplemental affidavit, Oshman stated the following, in pertinent part:

[] I never told Plaintiff that I was licensed to practice law in Texas.

[] At no time did I tell Plaintiff that I handled cases or practiced law in the State of Texas.

[] At no time did I or any representative of the Oshman Firm tell Plaintiff that any attorneys working for the Oshman Firm were licensed, handled cases, or practiced law in the State of Texas.

[] At no time did I or any representative of Oshman & Mirisola tell Plaintiff that any attorneys working for [] Oshman & Mirisola were licensed, handled cases, or practiced law in the State of Texas.

[] I never told Plaintiff that I would handle or file his case.

[] I never told Plaintiff that I would handle or file his case in Texas.

[] I deny that Plaintiff's case required filing a lawsuit in Texas. If a case was pursued, a determination of where the case would be filed was dependent on many things, including where the Kratom was manufactured, which is unknown. Ultimately, I decided it was not a viable case for me to accept and told Plaintiff in early 2020 that I was not accepting his case.

[] No representative of the Oshman Firm told Plaintiff that the Oshman Firm would handle or file Plaintiff's case. No representative of the Oshman Firm told Plaintiff that the Oshman Firm would handle or file Plaintiff's case in Texas.

[] No representative of Oshman & Mirisola told Plaintiff that Oshman & Mirisola would handle or file Plaintiff's case. No representative of [] Oshman & Mirisola told Plaintiff that Oshman & Mirisola would handle or file Plaintiff's case in Texas.

[] I never told Plaintiff that work was underway on this case before, after, or in November of 2020.

[] Since its inception and including in 2019, The Oshman Firm's website has always stated that I am licensed to practice law in New York and New Jersey. Exhibit C accurately represents portions of the Oshman Firm's website, and it contains the website address with the date and time it was accessed.

[] The web form that Plaintiff submitted through the Oshman Firm website required Plaintiff to agree to the terms and conditions by checking the box for terms and conditions before submitting the form

24

through the website. Two of the terms and conditions to submitting the web form states as follows:

NO LEGAL ADVICE

The material and information available on this Website is intended for educational and informational purpose only and does not constitute legal or other advice. Use of this Website does not replace consultations with a qualified legal professional and, as such, you should not rely upon the information provided herein as advice.

In addition, the information made available on the Website changes rapidly and, therefore, some of said information may be out of date. You agree to bear all risk associated with the use of, reliance on, any such information.

LAWYER-CLIENT RELATIONSHIP NOT CREATED

Your use of or access to this Website does not create a lawyer-client relationship. Your use of this Website may facilitate access to or communications with one or more lawyers at The Oshman Firm by way of e-mail transmissions or otherwise via this Website. Receipt of any such communications or transmissions by any lawyer or other member of The Oshman Firm does not create a lawyer-client relationship.

The No Legal Advice and the Lawyer-Client Relationship Not Created terms and conditions have been on the Oshman Firm's website since the inception of the website, including the year 2019. The requirement to agree to the terms and conditions before submitting a web form have also been on the Oshman Firm's website since the inception of the website, including the year 2019. Exhibit D accurately represents portions of the Oshman Firm's website, and it contains the website address with the date and time it was accessed.

Attached as exhibits to the supplemental affidavit were Exhibits C and D from the Oshman Firm's website. Exhibit C shows Theodore Oshman's picture, describes his education and achievements, and states he is admitted to practice law in New Jersey, New York, and the United States District Court for the Eastern and Southern

25

Districts of New York. Exhibit D shows the No Legal Advice and the Lawyer-Client Relationship Not Created terms and conditions from the Oshman Firm's website, which is quoted above.

As evidence in support of his jurisdictional allegations, Wilkison attached exhibits to his response to the special appearance, which include his sworn declaration, pleadings in the case, Defendants' discovery responses, text and email communications between Wilkison and Oshman, printed portions of the Oshman Firm's website, the "Kratom Questionnaire" Wilkison completed and submitted to the Defendants, information about the alleged seller of the Kratom consumed by Cody, the HIPAA authorization form, and Cody's autopsy report. According to Wilkison's sworn declaration, he wanted to find an attorney who was experienced in handling death and personal injury claims related to the consumption of Kratom, and he viewed the Oshman Firm's website in 2019. According to Wilkison's declaration, Ted Oshman states in a video on the Oshman Firm's website that the law firm's primary offices are in New York but also states that the firm "handle[s] cases all over the United States through affiliated relationships with other attorneys and with other law firms." According to Wilkison, the website stated the firm was experienced in handling Kratom cases and the website also included the following two statements:

The Oshman Firm was founded over 35 years ago on a commitment to service and excellence in all aspects of practicing law. Today, we provide the same level of service to those in need in all 50 states.
. . .
The Oshman Firm is headquartered in New York City and operates a nationwide practice helping Americans in all 50 states with legal matters arising out of harm inflicted by careless corporations, reckless people, and manufacturers.

According to his sworn declaration, Wilkison completed and submitted the website's interactive "free case evaluation" form in June of 2019, Wilkison received a telephone call from Ted Oshman, and they exchanged personal cell phone numbers. Wilkison's declaration states that Oshman then sent him a "Kratom Questionnaire" that Wilkison completed and submitted to Oshman in August of 2019, and the questionnaire stated at the top "Confidential Attorney-Client Privileged Document[.]" He further states that he also provided a signed "Authorization for Release of Health Information Pursuant to HIP[A]A" to the Defendants at their request, that there was a section of the form with blanks for the information of the attorney or firm that would be reviewing Cody's medical records, and Wilkison expected that portion would be filled in by the Defendants. According to Wilkison, it was his understanding, based at least in part on his communications with Ted Oshman and the documents provided by the Defendants, that the Defendants were representing him in the matter. Wilkison's declaration also states the following about the communications he had with Oshman:

27

[] I called Ted Oshman in November 2020, prior to Thanksgiving. I called the 800-number for the firm. Mr. Oshman told me that work was underway on my son's Kratom case, and he pulled up the details of my son's case while we spoke. This conversation with Ted Oshman occurred prior to the two-year anniversary of my son's death. Mr. Oshman referenced the holidays coming and said we should touch base after the holidays were over. One of my texts in 2021, a true and correct copy of which is contained in Exhibit 16 to the Response, references a conversation with Mr. Oshman in "last November," the year was 2020. This is a reference to the call in November with Ted Oshman that I have described in this paragraph.

[] Attached to the Response as Exhibit 16 are true and correct copies of the text exchanges that I had with Ted Oshman.

[] I had multiple text communications with Ted Oshman, inquiring about when activity would take place on my son's death case. On July 12, 2021, I contacted Ted Oshman to check on the status of the case. Mr. Oshman said to me the next day: "will get back to you tomorrow." He failed to do so.

[] I contacted Mr. Oshman about my son's Kratom case on October 4, 2021.

[] I contacted Ted Oshman on April 14, 2022, to find out when activity would take place on my case. Oshman told me that same day: "let's follow up over the weekend." Oshman did not follow up as promised.

[] On June 6, 2022, I again contacted Oshman about my son's death case.

[] On June 13, 2022, Oshman indicated to me by phone and a follow-up email that Defendants would not be going forward with the wrongful death lawsuit pertaining to my son's passing. This was the first time that the Oshman Firm[] informed me that they would not litigate the legal claims arising out of my son's death. A true and correct copy of this email from Mr. Oshman communicating to me for the first time that he and the Oshman Law Firm[] would not litigate my son's wrongful death case is attached to the Response as Exhibit 17.

[] In the last email from Mr. Oshman that terminated our relationship, Exhibit 17, there is no mention by him of the statutes of limitations that applied to the wrongful death claims for my son's passing. In fact, Mr. Oshman never mentioned the statutes of limitations in any of our communications. . . .

28

In a purposeful availment analysis, we focus not on the quantity of the defendant's contacts with Texas, but on the quality and nature of those contacts. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 151. Only the defendant's contacts are relevant, not the unilateral acts of another party or a third person. *See id.*

Wilkison's initial two allegations of purposeful availment by the Defendants are as follows:

> [] The Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves of the privileges and benefits of conducting business in Texas. Defendants targeted the Texas market for their legal services, represented to the public that they handled litigation in Texas, as well as all the other states comprising the United States, communicated and contracted with Plaintiff, a Texas resident, as part of "signing up" his Kratom wrongful death case, and took specific, deliberate actions to financially profit from serving the Texas legal market and from signing up Plaintiff's wrongful death case. Defendants requested and received a medical records authorization from Plaintiff that would designate Defendants as the attorney representative for Plaintiff, authorizing Defendants to review and communicate with others regarding the health records of Plaintiff's deceased son, Cody.
>
> [] The Court has personal jurisdiction over Defendants, nonresidents, because Defendants committed a tort, which is the subject of this suit, in whole or in part in Texas. Defendants misrepresented their background, qualifications, and capacity to represent Plaintiff. Defendants failed to timely file a lawsuit in Texas for the wrongful death of Plaintiff's son or provide proper disclosure and notification of their unwillingness to take the necessary actions to preserve Plaintiff's rights and claims pertaining to the wrongful death of Plaintiff's son.

The facts show that Wilkison accessed the Defendants' website seeking information about Kratom and about potentially filing a lawsuit. Wilkison alleges that the Oshman website states the Defendants litigate in all fifty states.

Oshman responded to Wilkison's online form submission through the website and had communications through text, telephone, and email with Wilkison. Oshman filed an original and supplemental affidavit disputing the jurisdictional allegations. Oshman describes his evaluation of the information sent to him by Wilkison and states that the communications were made so that Oshman could determine whether the case was a viable one for the Defendants to accept.

Relationship Between Oshman and Wilkison

Legal work performed outside Texas for a Texas resident is not a proper basis for a trial court to exercise personal jurisdiction over the non-resident attorneys who perform the legal work. *See Ahrens & DeAngeli, P.L.L.C. v. Flinn*, 318 S.W.3d 474, 484-85 (Tex. App.—Dallas 2010, pet. denied), *overruled on other grounds by Steward Health Care Sys., LLC v. Saidara*, 633 S.W.3d 120, 127-29, 127 n.8 (Tex. App.—Dallas 2021, no pet.). A non-resident attorney's telephone calls and correspondence directed to the state also are insufficient. *Id*. To establish purposeful availment, non-resident attorneys generally must take affirmative action to promote their business in the forum state. *Id.* (trial court lacked specific personal jurisdiction over Washington law firm where the legal work at issue was performed in

30

Washington or Idaho and relevant communications were made from there to Texas); *Bergenholtz v. Cannata*, 200 S.W.3d 287, 295 (Tex. App.—Dallas 2006, no pet.). Here, Wilkison presented no contract, fee agreement, invoices, or pleadings evidencing that any of the Defendants agreed to represent Wilkison in any litigation in Texas. In fact, Wilkison concedes that the Defendants did not accept his case.

The Fort Worth Court of Appeals has concluded that even if a nonresident attorney has an attorney-client relationship with a Texas resident, that fact standing alone, does not provide the minimum contacts necessary to support personal jurisdiction over the nonresident attorney. *Gordon & Doner, P.A. v. Joros*, 287 S.W.3d 325, 334-35 (Tex. App.—Fort Worth 2009, no pet.) (discussing *Eakin v. Acosta*, 21 S.W.3d 405, 407 (Tex. App.—San Antonio 2000, no pet.), *abrogated in part on other grounds by BMC Software Belg., N.V.*, 83 S.W.3d at 794 n.1)). And merely routine correspondence and interactions attendant to that attorney-client relationship between a client with a nonresident attorney have been declared insufficient to confer specific personal jurisdiction over a nonresident attorney. *Markette v. X-Ray X-Press Corp.*, 240 S.W.3d 464, 468-69 & n.2 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Wilkison does not dispute that Oshman is not licensed to practice law in Texas and that Oshman never filed a lawsuit in Texas on behalf of Wilkison or any other clients. Wilkison also does not dispute the Defendants' evidence that the terms and

31

conditions of the website he accessed stated that his use or access of the website did not create an attorney-client relationship, and Wilkison does not dispute that the website required him to accept these terms and conditions before submitting the form through the website. That said, Wilkison primarily relies upon his contact with Oshman via Oshman's website, email, and telephone.

Website Activity and Communications

This Court has previously discussed interactive websites and personal jurisdiction. In *Skylift, Inc. v. Nash*, No., 09-19-00389-CV, 2020 Tex. App. LEXIS 3191, at **1-3 (Tex. App.—Beaumont Apr. 16, 2020, no pet.) (mem. op.), the plaintiffs, individually and as representatives of Charles Bagley's estate, sued the defendants, including Skylift, Inc., in Texas court after a piece of equipment manufactured and sold to distributors by Skylift, Inc. allegedly struck and killed Bagley while he was working at a refinery in Port Arthur, Texas. After Skylift, Inc. filed a special appearance challenging general and specific jurisdiction, the plaintiffs argued, among other things, that Skylift Inc.'s website provided a basis for purposeful availment and specific jurisdiction because Skylift, Inc. advertised in Texas. *See id.* at **6, 14. In examining whether the level of interactivity of Skylift, Inc.'s website supported the exercise of specific jurisdiction, we explained:

> When assessing contacts based on interactive websites, we evaluate the defendant's contacts according to a sliding scale similar to the one used in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa[.] 1997). *See Washington DC Party Shuttle, LLC v.*

*IGuide Tours*, 406 S.W.3d 723, 737 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). "[T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Zippo Mfg.[] Co.*, 952 F. Supp. at 1124; *Washington DC Party Shuttle*, 406 S.W.3d at 737. On one end of the scale are passive websites, where the foreign defendant simply posted information that can be viewed in other jurisdictions, and these will not support the exercise of personal jurisdiction. *Washington DC Party Shuttle*, 406 S.W.3d at 737. On the other end of the scale are websites through which a nonresident defendant has entered into contracts with residents of the forum state "'that involve the knowing and repeated transmission of computer files' over the internet." *Id.* (quoting *Zippo Mfg.[] Co.*, 952 F. Supp. at 1124). In between are cases involving interactive websites where a user can exchange information with a host computer. *Id.* In those situations, "we examine 'the level of interactivity and commercial nature of the exchange of information that occurs' on the website." *Id.* (quoting *Zippo Mfg.[] Co.*, 952 F. Supp. at 1124).

It is Skylift's purposeful contacts with Texas, not nationally, that are relevant. *See J. McIntyre Machinery, Ltd.[] v. Nicastro*, 564 U.S. 873, 886 [] (2011); *Trokamed GmbH v. Vieira*, No. 01-17-00485-CV, 2018 Tex. App. LEXIS 3901, [at **11-12] (Tex. App.—Houston [1st Dist.] May 31, 2018, no pet.) (mem. op.) (noting the nonresident defendant sought a national publication, not a Texas one). While anyone nationwide may have been able to access the website, there is no evidence that Skylift specifically targeted Texas with advertising. The website was akin to a manufacturer placing advertisements in a nationally circulated magazine as opposed to one circulated solely in Texas. *See C.W. Brown Mach. Shop, Inc. v. Stanley Machinery Corp.*, 670 S.W.2d 791, 792, 794 (Tex. App.—Fort Worth 1984, no pet.) (concluding no jurisdiction existed when the nonresident defendant advertised in national magazines but did not use local, regional, or state advertising media to sell its product); *see also CMMC[ v. Salinas]*, 929 S.W.2d [435,] 439 [(Tex. 1996)] (determining there was no jurisdiction and noting that there was no effort to market in Texas except advertisements placed in magazines with national circulation). Skylift's current president testified that no sales or contracts are consummated through the website. Rather, people who have questions are inquiries may submit them. Additionally, Skylift's former president averred in his affidavit that Skylift did not advertise or solicit business in Texas.

33

> We conclude the level of interactivity on Skylift's website does not support the exercise of specific jurisdiction.

*Id.* at **15-17. Also, in *Riviera Operating Corp. v. Dawson*, 29 S.W.3d 905, 911 (Tex. App.—Beaumont 2000, pet. denied) (a general jurisdiction case) and *Buckeye Aviation, L.L.C. v. Barrett Performance Aircraft, Inc.*, No. 09-10-00247-CV, 2011 Tex. App. LEXIS 4506, at **19-22 (Tex. App.—Beaumont June 16, 2011, pet. denied) (mem. op.) (which involved both general and specific jurisdiction), we explained that the exercise of personal jurisdiction based on an interactive website is not appropriate where there is no evidence that the defendant engaged in business transactions or entered into contracts over the internet with a Texas resident.

Here, the record shows that the Defendants' website is to some degree an interactive website. Wilkison accessed and located the website via a search he conducted on the internet. Wilkison then chose to submit a form through the website, Wilkison exchanged emails with Oshman, and telephone communications between Wilkison and Oshman followed. The evidence in the record shows that the website is a national website, not a Texas one. The website included a disclaimer that the use and access of the website did not create an attorney-client relationship, and the form Wilkison submitted expressly notified Wilkison that it did not create an attorney-client relationship. Theodore Oshman stated in his affidavit that neither he nor anyone with the Oshman Firm or Oshman & Mirisola ever told Wilkison that they handled cases in Texas, were licensed in Texas, or practiced law in Texas. There is

34

no evidence on this record that Wilkison signed any agreement for representation by any of the Defendants. And there is no evidence in the record that the Defendants targeted Texas or Texas residents. So, this website, like the ones discussed above, were in the middle of the sliding scale. After examining the level of interactivity and the commercial nature of the exchange of information that occurs on the website, we conclude that the level of interactivity here does not support the exercise of specific jurisdiction. *See Skylift, Inc.*, 2020 Tex. App. LEXIS 3191, at **15-17; *Buckeye Aviation, L.L.C.*, 2011 Tex. App. LEXIS 4506, at **19-22; *Riviera Operating Corp.*, 29 S.W.3d at 911.

Emails, Telephone Calls, and Forms Filled Out by Wilkison

Wilkison also contends that his emails and telephone calls support personal jurisdiction. The record shows there were emails and telephone calls exchanged between the parties, and Oshman agrees but emphasizes that Oshman was not located in Texas when any of the phone calls or emails were exchanged. The mere exchange of emails or telephone calls between a nonresident and a Texas resident does not suffice to show the nonresident purposefully availed himself of doing business in Texas. *See, e.g.*, *Old Republic Nat'l Title Ins. Co.*, 549 S.W.3d at 560 ("[o]n their own, numerous telephone communications with people in Texas do not establish minimum contacts[]"); *Majors Mgmt., LLC v. Price & Co.*, No. 09-17-00063-CV, 2018 Tex. App. LEXIS 1103, at **20-21 (Tex. App.—Beaumont Feb.

35

8, 2018, no pet.) (mem. op.) (where nonresident defendant's agents or representatives never entered Texas, the telephone calls, email messages, and wire transfers from nonresident defendant to Texas resident were insufficient to demonstrate the nonresident defendant purposefully did business in a Texas forum); *Bryan v. Gordon*, 384 S.W.3d 908, 916-17 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (making multiple telephone calls and sending emails to a Texas resident was insufficient for specific jurisdiction); *KC Smash 01, LLC v. Gerdes Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 393 (Tex. App.—Dallas 2012, no pet.) (finding no purposeful availment where nonresident defendant never entered the state, and its contacts with Texas resident were through telephone and email communications and the sending of payments to the plaintiff in Texas); *Ahrens & DeAngeli, P.L.L.C.*, 318 S.W.3d at 484 ("[t]elephone calls and correspondence as activities directed at the forum are generally insufficient[]" to establish minimum contacts); *Olympia Capital Assocs., L.P. v. Jackson*, 247 S.W.3d 399, 418 (Tex. App.—Dallas 2008, no pet.) (holding that neither the existence of a contract between the nonresident defendant and a resident nor engaging in communications related to that contract are sufficient to establish the minimum contacts necessary to support the exercise of personal jurisdiction over the nonresident defendants); *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201, 213 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("numerous

36

telephone and facsimile communications with people in Texas relating to an alleged contract do not establish minimum contacts").

Next, Wilkison asserts that he filled out a Kratom questionnaire provided on Oshman's website, mailed information to Oshman, and signed a HIPAA authorization form to allow Oshman to obtain medical records. The "Kratom Questionnaire" is a five-page form with blanks completed and signed by Wilkison, is labeled at the top "Confidential Attorney-Client Privileged Document[,]" and asks for information related to Wilkison's contact information and Cody's purchase and consumption of Kratom and cause of death. The "Authorization for Release of Health Information Pursuant to HIPAA" form includes blank boxes for the patient's name, date of birth, social security number, and address, which was completed with Cody's information. The form authorizes the release of certain records (here initials "RW" were indicated in the blanks next to records related to alcohol/drug treatment, mental health information, and HIV-related information) to the person or entity listed in box 8 (which in this instance was left blank), gave authorization for an identified individual health care provider (which in this instance was left blank) to release such information, and authorized that the health information could be discussed with the identified attorney or governmental agency (which in this instance was left blank). This HIPAA authorization form that Wilkison relies on for his argument that the Defendants misrepresented that they were representing him

37

shows that the Defendants never filled in the blank with their information designating them as Wilkison's counsel, and we have nothing in the record showing that the Defendants ever used the HIPAA authorization to obtain medical records on Wilkison's son. While it is true that paperwork was signed by Wilkison in Texas, it is of no jurisdictional importance because we look at the Defendants' conduct, and not Wilkison's. *See Volkswagen Aktiengesellschaft*, 660 S.W.3d at 413-14. The online inquiry and form filled out by Wilkison in Texas depicts Wilkison's activities in Texas, but it does not demonstrate or establish defendants engaged in conduct or activities in Texas.

Wilkison's Allegation That the Suit Would Have Been Filed in Texas

Next, Wilkison alleges that the Defendants purposefully availed themselves of the privilege of conducting activities within Texas because if they had filed suit then the suit would have been filed in Texas. "[A] plan[] for future conduct directed at the forum is not sufficient to establish present personal jurisdiction on the basis that a tort has been committed in Texas." *Hatzenbuehler v. Essig*, 526 S.W.3d 657, 665 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (op. on reh'g) (citing *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 888 (Tex. 2017)). Furthermore, Wilkison disputed in his affidavit that a suit would have been filed in Texas.

<u>Reliance on *LG Chem* and *Cartlidge*</u>

In Wilkison's Supplement to his Motion for Reconsideration, he argued that, under the *LG Chem* opinion, whether the Defendants were intending through their communications with Appellee to file a case in Texas was irrelevant and should be disregarded. The trial court stated it relied on the analysis in the *LG Chem* and *Cartlidge* cases in vacating its earlier order and denying the Defendants' special appearance. We find both cases distinguishable, and we conclude neither case supports a finding of purposeful availment here.

In *LG Chem*, the plaintiff was allegedly injured when a lithium-ion battery he used to charge his e-cigarette allegedly "exploded" in his pocket. 670 S.W.3d at 344. The battery was allegedly manufactured by LG Chem, Ltd. ("LG Chem"), a company headquartered in South Korea, and then distributed by its American distributor, LG Chem America, Inc. ("LGCAI"). *Id.* The plaintiff brought products-liability claims against LG Chem, LGCAI, as well as the manufacturer of the e-cigarette and the store that sold the plaintiff the battery. *Id.* In their special appearances, LG Chem and LGCAI did not dispute that they purposefully availed themselves of the privilege of conducting activities through the sale, shipment, or distribution of model 18650 batteries to Texas manufacturers. *Id.* at 348. Instead, they argued that their contacts with Texas should not subject them to personal jurisdiction because the plaintiff's claims did not arise out of and were not

39

sufficiently related to their contacts. *Id.* at 345, 348. When analyzing the relatedness prong, the Texas Supreme Court disagreed with the defendants' argument that the Court must focus on the absence of any intent to serve the market of individual consumers. *Id.* at 349-51. In affirming the trial court's denial of LG Chem's and LGCAI's special appearances, the Texas Supreme court held that, because LG Chem and LGCAI did not dispute that they purposefully availed themselves of the privilege of doing business in Texas by selling and distributing model 18650 lithium-ion cells in Texas and because the Court determined the plaintiff's claims were sufficiently related to the LG Chem's and LGCAI's undisputed contacts with Texas to satisfy due process, Texas courts have specific personal jurisdiction over LG Chem and LGCAI. *Id.* at 348-51.

*LG Chem* is distinguishable from the case before us. Unlike the facts in *LG Chem*, the present case is not a products-liability case, and the Defendants have never conceded any contacts with Texas sufficient for purposeful availment. Moreover, the pleadings and evidence submitted by the defendants here demonstrate that the defendants dispute that they have purposefully availed themselves of doing business in Texas and maintain that there is a lack of sufficient contacts with Texas to establish purposeful availment.

In *Cartlidge*, two plaintiffs sued Cartlidge in Harris County, Texas, for legal malpractice. 9 S.W.3d at 344. The plaintiffs engaged Cartlidge to represent them in

a lawsuit against DuPont and Methodist Hospital in a lawsuit in Nevada. *Id.* The plaintiffs, one of whom was a Texas resident, solicited Cartlidge to represent them and file suit in Nevada through Lowell Cage, a Texas attorney, who was familiar with Cartlidge's work in products liability litigation in Nevada. *Id.* Cartlidge, who is not licensed to practice law in Texas but is licensed in Nevada, represented at least twenty-five clients from around the country in similar litigation. *Id.* Cartlidge sent documents to Texas which constituted solicitation offers to provide legal representation for the plaintiffs in the litigation. *Id.* Cartlidge sent a letter agreement to the plaintiffs in which he stated that he was representing them. The letters were on Cartlidge's letterhead and set forth the fee arrangement, which involved splitting the attorneys' fees between Cartlidge and Cage. The letters also designated Cartlidge as lead counsel. *Id.* Cartlidge also sent the plaintiffs retainer agreements, which were on his letterhead, stating that he would represent them in the matter and that authorized him to prosecute the case. The agreements, however, did not specify that Cartlidge would only represent the plaintiffs in Nevada. *Id.* The letter agreements and retainer agreements were sent to Houston for the plaintiffs' signatures, the plaintiffs signed them in Houston, and the plaintiffs returned the signed agreements to Cartlidge. *Id.* It was undisputed that Cartlidge neither signed the contracts in Texas nor performed any of his obligations under the contracts in Texas. *Id.* Cartlidge had other contacts with Texas for clients other than the plaintiffs involved

41

in the suit, for example there was evidence that he was involved in litigating a product liability case for ninety-three clients against Methodist Hospital in Harris County, representing Texas residents in product liability litigation that was filed in Nevada, and that he had filed sixty-one bankruptcy claims against a products liability litigation defendant on behalf of clients in Harris County. *Id.* at 345.

The plaintiffs filed suit against Cartlidge and Cage in Harris County and asserted that Cartlidge filed claims on the plaintiffs' behalf against Methodist Hospital in Nevada, but that those claims were dismissed because the Nevada courts did not have jurisdiction over the hospital. *Id.* The plaintiffs alleged that Cartlidge failed to either refile the case in Texas where the hospital was subject to the jurisdiction of the courts or refer the case to someone who could refile in Texas, and that Cartlidge allowed the claim to lapse without advising them that the claim could have been filed in Texas. *Id.* In affirming the trial court's denial of Cartlidge's special appearance, the Fourteenth Court of Appeals explained that Cartlidge had a substantial connection with Texas necessary for a finding of minimum contacts and that the plaintiffs' claims arose out of the contracts:

> Here, Cartlidge is being sued because of alleged legal malpractice committed by him during the course of his legal relationship with [the plaintiffs]. During the course of this legal relationship, Cartlidge corresponded with [the plaintiffs], either through Lowell Cage or directly, several times. The acceptance letters and retainer agreements that constituted contracts between the parties, and the progress reports Cartlidge admitted he sent [the plaintiffs], taken together, demonstrate Cartlidge had purposeful, repeated, if not

42

frequent, contacts with the State. Plaintiffs' claims below against Cartlidge arise out of the contracts they entered into with him in Texas. Thus, it is irrelevant to our analysis where the alleged tort of malpractice occurred.

With respect to interstate contractual obligations, the Supreme Court has emphasized that parties who reach out beyond one State and create continuing relationships and obligations with citizens of another State[] are subject to regulation and sanctions in the other State for consequences of their activities. Indeed, so long as it creates a substantial connection with the forum State, even a single act can support jurisdiction. Cartlidge's contacts with Texas consist of the four contracts, two with each client, and his subsequent correspondence with them regarding the progress of their lawsuits. . . .

. . . .

. . . . It is sufficient for purposes of due process minimum contacts that the suit brought by [the plaintiffs] is based on contracts which have a substantial connection with Texas. Because the substantial connection between Cartlidge and his clients in Texas came about by his actions which were purposefully directed toward Texas, his contacts with this State are not random, fortuitous or attenuated. Indeed, Cartlidge's contacts with Texas are imbued with a quality and nature that insulates them from any such challenge. Inasmuch as these contracts had a substantial connection with Texas, Cartlidge could foresee that if his performance were deficient it would inflict economic injury on a resident of Texas. . . .

The quality and nature of Cartlidge's contacts with Texas, enhanced by the interest of Texas in a suit involving a nonresident attorney representing individuals in Texas, provide an adequate basis for the assertion of jurisdiction in this case. Accordingly, we find that Cartlidge's purposeful contacts with [the plaintiffs] in Texas constituted sufficient minimum contacts to support specific jurisdiction and satisfy due process requirements.

*Id.* at 348-49 (internal footnotes and citations omitted).

In the present case, unlike the facts in *Cartlidge*, Wilkison and the Defendants did not execute a client representation agreement, the Defendants did not file any lawsuits on behalf of the plaintiff, and Defendants had no other significant contacts

43

with Texas. Here, unlike *Cartlidge*, the quality and nature of the Defendants' contacts with Texas do not provide an adequate basis to support a finding of specific personal jurisdiction. *See also Rana Shipping Transp., Indus., & Trade, Ltd. v. Davey & Brogan, P.C.*, No. 05-22-00446-CV, 2023 Tex. App. LEXIS 1805, at **10-12 (Tex. App.—Dallas Mar. 21, 2023, no pet.) (mem. op.) (in plaintiffs' legal malpractice suit, attorney's and defendant-firm's contacts were insufficient to establish purposeful availment where the plaintiffs did not assert that the defendant-firm sought clients or affirmatively promoted its business in Texas, the attorney's only contacts with Texas were his communications with Texas-based individuals in furtherance of the legal work he was retained to do, and he performed the legal work in Virginia). After carefully examining the evidence presented by the parties pertaining to specific jurisdiction over the Appellants, we conclude that *LG Chem* and *Cartlidge* are distinguishable, and the evidence does not support the trial court's finding of specific jurisdiction on this record.

Conclusion

We conclude that Wilkison failed to meet his burden to present evidence negating the Defendants' challenge to Wilkison's jurisdictional allegations. *See Kelly*, 301 S.W.3d at 659; *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 764. We find the trial court erred in denying the special appearance because the Defendants did not purposefully avail themselves of the privilege of conducting activities in Texas, and

the Defendants lack sufficient minimum contacts to support specific jurisdiction in Texas. *See Moki Mac*, 221 S.W.3d at 575. Accordingly, we need not address whether the suit arises from or relates to the Defendants' contacts with the forum.[7] *See id.* at 579 (specific-jurisdiction analysis has two co-equal components, purposeful availment and relatedness). We sustain the Appellants' issue on appeal. We reverse the trial court's order denying Appellants' special appearance and render the judgment the trial court should have rendered, dismissing Appellee's claims against Appellants for lack of personal jurisdiction. *See* Tex. R. App. P. 43.2(c).

REVERSED AND RENDERED.

LEANNE JOHNSON
Justice

Submitted on December 21, 2023
Opinion Delivered March 14, 2024

Before Golemon, C.J., Johnson and Wright, JJ.

---

[7] Having concluded that there is no basis for specific jurisdiction over the Appellants, we need not address the Appellants' complaint that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice because it would not afford Appellants any greater relief. *See* Tex. R. App. P. 47.1; *Booth v. Kontomitras*, 485 S.W.3d 461, 488 n.14 (Tex. App.—Beaumont 2016, no pet.).